Matthew T. Christensen, ISB: 7213
ANGSTMAN JOHNSON
199 N. Capitol Blvd., Ste 200
Boise, Idaho 83702
Telephone: (208) 384-8588
Facsimile:  (208) 853-0117
Email: mtc@angstman.com

Attorney for Plaintiffs/Debtors

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF IDAHO

| | |
|---|---|
| In re:<br><br>RHINO RUSH, LLC,<br><br>       Debtor.<br>_____<br>RHINO RUSH, LLC, Debtor in Possession,<br><br>       Plaintiff,<br>vs.<br><br>RAW PHARMA, LLC, a Utah limited liability company; RHINO RUSH, LLC, a Texas limited liability company; and DOES 1-25,<br>       Defendants. | Case No. 19-00302-TLM<br><br><br><br><br>Adversary No.  19-_____-TLM<br><br>COMPLAINT FOR INJUNCTIVE RELIEF AND TO AVOID TRANSFERS |

The Plaintiff, Rhino Rush, LLC ("Debtor" or "Rhino Rush"), complains and allege as follows:

## NATURE OF ACTION

1.      In this Adversary Proceeding, the Debtor seeks injunctive relief restraining Raw Pharma, LLC, from continuing to exert dominion and control over the assets of the Debtor and requiring Raw Pharma, LLC, to return assets already taken and/or liquidated by Raw Pharma, LLC.  Because the Debtor (a) has a reasonable likelihood of a successful reorganization; (b) continued and concurrent pursuit of, and control over, Rhino Rush's assets would cause irreparable harm to the Debtor's ability to reorganize; (c) injunctive relief would cause no prejudice to Raw Pharma due to the preferential nature of the transfers sought to be avoided; and (d) such relief serves the public interest, the Debtor requests the Bankruptcy Court enjoin Raw Pharma from further exercising control over the Debtor's assets and requiring Raw Pharma to return the assets already taken.

2.      Secondly, the Debtor seeks to avoid the pre-petition transfers of assets to Raw Pharma.  These transfers are described below and are avoidable transfers pursuant to 11 U.S.C. §§547 and/or 548.

## JURISDICTION AND PARTIES

3.      Rhino Rush is the Debtor in Case No. 19-00302-TLM under Chapter 11 of the Bankruptcy Code.

4.      Defendant Raw Pharma, LLC ("Raw Pharma") is a Utah limited liability company with its principal place of business located in Texas and a potential creditor of the Debtor.

5.      Defendant Rhino Rush, LLC ("TX Rhino Rush") is a Texas limited liability company with its principal place of business located in Plano, Texas.  TX Rhino Rush was created March 18, 2019 by filing a Certificate of Formation with the Texas Secretary of State. The registered agent in Texas for TX Rhino Rush is Jesse McMullin.  Mr. McMullin is also the CEO of TX Rhino Rush.

6.      The Managing Member of TX Rhino Rush is Packaging and Container, LLC ("PandC").  PandC is an Idaho limited liability company formed in December 2011 by Jesse McMullin.  Jesse McMullin is the registered agent and managing member of PandC.  PandC registered to do business in the state of Texas on March 10, 2018.

7.      Defendants Does 1-25 are individuals or entities who also may exert dominion or control over assets of the Debtor.  These individuals or entities may have acted together or in conspiracy with Raw Pharma.  The exact identify of these individuals and entities is presently unknown.  At such time as the Debtor learns the identity of these individuals and entities, this Complaint will be supplemented or amended.

8.      The Debtor filed a petition for relief in Case No. 19-00302-TLM under Chapter 11 of the Bankruptcy Code on March 22, 2019.

9.      This is a "related to" proceeding under 28 U.S.C. § 157(c).  Venue is proper under 28 U.S.C. § 1409(a).

10.     This proceeding is brought pursuant to 11 U.S.C. §§ 105, 547, 548 and/or 550, Rule 65 of the Federal Rules of Civil Procedure and Rules 7065 and 7001(7) of the Federal Rules of Bankruptcy Procedure.

11.     The Debtor specifically consents to this Court entering final orders in this proceeding.

## **FACTUAL BACKGROUND**

12.     The Debtor realleges all of the foregoing paragraphs as if fully set forth herein.

13.     The Debtor is in the business of marketing and distributing energy shots and energy drinks under the name "Rhino Rush".

14.     The managers of the Debtor are Josh Swenson and Jeremy Swenson.   Josh Swenson serves as the CEO of Rhino Rush.  Jeremy Swenson is involved as a manager, but also is heavily involved in directing and running other businesses owned by the Swensons.   Josh Swenson is the Debtor's day-to-day operator.

15.     In 2014, the Debtor contracted with Raw Pharma to manufacture and supply energy shots and energy drinks for sale and distribution by Rhino Rush (the "2014 Agreement"). The 2014 Agreement required the Debtor make certain minimum purchases of energy shots from Raw Pharma.

16.     In 2017, after the Debtor allegedly defaulted in ordering minimum numbers of energy shots, the parties signed a "Forbearance Agreement and First Amendment to Manufacturing and Supply Agreement," (the "Forbearance Agreement") a true and correct copy of which is attached hereto as ***Exhibit A***.

17.     The Forbearance Agreement continued the minimum purchase requirements originally outlined in the 2014 Agreement.

18.     The Forbearance Agreement also added payment provisions which provided that the Debtor would technically default under the terms of the Forbearance Agreement if "during a Contract Year [Debtor] is, in the aggregate, more than 45 days late in making payments for Products."

19.     In addition to the Forbearance Agreement, Raw Pharma required the Debtor grant it a security interest to secure obligations under the Forbearance Agreement.  A true and correct copy of the Security Interest is attached hereto as ***Exhibit B***.

20.     After the Forbearance Agreement was effective, the Debtor continued to source products from Raw Pharma.

21.     However, in March 2019, Raw Pharma determined that, in the aggregate, it believed the Debtor had accumulated more than 45 days in late payments, and consequently sought to declare a default against the Debtor.

22.     Jesse McMullin ("McMullin") and Mark Clark ("Clark") (owners or representatives of Raw Pharma; McMullin is also the managing member (through PandC) of TX Rhino Rush) arrived at Jeremy Swenson's office at about 9:00 AM on Monday, March 11, 2019. The office was not Rhino Rush's office, but was for a mortgage brokerage company operated by Jeremy Swenson.  Josh Swenson (Rhino Rush's CEO) was returning from being out of town and was not available at that time.

23.     McMullin stated that he needed to talk to Jeremy about Rhino Rush and would not wait until Josh returned from a weekend in McCall.  Jeremy spoke with McMullin and Clark for about 30 minutes before he stated that they needed to relocate so the discussion did not affect the mortgage office, which was small and not private.  The individuals then relocated to a local coffee shop near the office.

24.     McMullin and Clark told Jeremy that they were there to shut down Rhino Rush because of the number of times during the past year the payment to them was late.  Again, at the time of this conversation, all payments required to be made to Raw Pharma had been made – there was simply an aggregate amount of late days in excess of 45 days.

25. McMullin and Clark stated that the reason they wanted to talk to Jeremy first is that they planned to pit brother against brother to get Jeremy to sign a document giving up ownership of the Rhino Rush logo and with that they would pressure Josh into giving in to their demands.

26. McMullin and Clark stated to Jeremy that if he signed their requested documents that Raw Pharma would provide a "pillow" to land on which was to allow Rhino Rush to sell thru all the inventory in the warehouse and pay off other creditors.

27. McMullin even quoted Jeremy rough numbers of amounts Raw Pharma was willing to pay to other creditors. McMullin wasn't aware of the total debt of the company but said that essentially the Debtor should have enough inventory to bring in approximately $600k.

28. McMullin stated that if Jeremy did not sign the requested documents, Raw Pharma would take all offers off the table and foreclose on their security interest. McMullin told Jeremy that Raw Pharma had people waiting that moment at the Ada County courthouse, ready to get a court injunction and would have the Sheriff start removing property that day if Jeremy did not sign the documents.

29. Jeremy informed McMullin and Clark that he was not going to do anything behind his brothers back. Again, McMullin reiterated that if Jeremy did not sign the document, Raw Pharma would immediately get an injunction and lock the doors of Rhino Rush while Josh remained out of town. McMullin stated that if Jeremy signed the document, Raw Pharma would wait until Josh got back into town to discuss the situation with both of the Swensons together – but only if Jeremy signed the documents first.

30.     Additionally, McMullin stated that if Jeremy called anyone (including, specifically, Josh or the company attorney) prior to signing the documents, Raw Pharma would immediately shut Rhino Rush down.

31.     After about 30 minutes at the coffee shop with McMullin and Clark, Raw Pharma's attorney, Michael Howell, appeared at the coffee shop with the documents, expecting Jeremy to sign them.

32.     After repeated requests, McMullin and Clark agreed that Jeremy could telephone his Mom, which he did.  However, McMullin and Clark required that the phone call be done in their presence so they could monitor the call.  Jeremy and his Mom talked 3-4 times during the hours that he was at the coffee shop.

33.     After discussing the situation with his Mom, Jeremy proposed to McMullin and Clark that he could sign the documents in a meeting with Josh.  McMullin informed Jeremy that Raw Pharma would not agree to that because Jeremy might not sign if he discussed the situation with Josh.  McMullin reiterated that if Jeremy didn't sign the documents, that Raw Pharma would shut Rhino Rush's business down, all employees would be terminated and lose their jobs, and Josh would return to be locked out of his business.

34.     Jeremy repeated to McMullin that he would not sign documents without Josh's knowledge or input.  McMullin told Jeremy that Josh had "bad mouthed" him and didn't care about Jeremy and that was reason enough for Jeremy to sign the documents.  McMullin repeated the threats to shut Rhino Rush down before Josh returned to town.  McMullin also repeated the comments that if Jeremy signed the documents without Josh, that Raw Pharma would then meet with the brothers together and create a plan to pay off people that Rhino Rush owed money to.

35.     After several hours of dealing with McMullin and the repeated threats to immediately shut down Rhino Rush, Jeremy signed a Power of Attorney document.  This was extremely emotionally distressing to Jeremy because he thought it was wrong to sign without Josh's knowledge but also didn't want him to come back in town to a closed business, which is what McMullin had repeatedly threatened.

36.     After Jeremy signed the Power of Attorney, he was allowed to call Josh.  Later that day, Josh and Jeremy met at another coffee shop with McMullin and Clark to further discuss what had been done and the threats that Raw Pharma had made to coerce Jeremy into signing the Power of Attorney.  Josh and Jeremy left that coffee shop without having signed anything – McMullin and Clark warned them not to talk to any attorneys before reconvening that evening.

37.     After a lot of discussion with Josh and going back and forth with Raw Pharma, and based on Raw Pharma's repeated threats of foreclosure and immediate closure of the Rhino Rush business, together with Raw Pharma's promises to provide a "pillow" to pay back Rhino Rush's other creditors, Josh and Jeremy were pressured into signing additional documents.

38.     Again, however, McMullin, Clark and Howell did not allow Josh or Jeremy to review the documents prior to signature, to discuss the documents with their counsel, or have the documents reviewed by counsel.  In addition, McMullin, Clark and Howell did not allow the Swensons to discuss the situation or documents with any other owners of Rhino Rush.

39.     The documents signed by Josh and Jeremy at Raw Pharma's insistence and based on Raw Pharma's repeated threats to shut the business down include (a) a Power of Attorney; (b) a Voluntary Asset Surrender and Transfer Agreement; (c) a General Assignment and Bill of Sale; (d) a Copyright, Trademark and Domain Name Assignment Agreement; (e) a Personal Guaranty; (f) a form letter addressed to "GS1 US, Inc." purporting to transfer all GS1 Company Prefixes;

and (g) a form letter to customers, purporting to assign payments and the Rhino Rush brand (all collectively referred to herein as the "Transfer Documents").

40.    True and correct copies of the Transfer Documents are attached hereto as ***Exhibit C***.

41.    The day after the Transfer Documents were signed, McMullin told the Swensons that the funds to pay Rhino Rush creditors weren't available and offered to assist the Swensons in paying Rhino Rush creditors through their separate unrelated businesses.

42.    Based on the Transfer Documents, Raw Pharma has taken control of the Rhino Rush business and brand.

43.    Upon information and belief, after taking control of the Debtors assets, Raw Pharma further transferred some or all of the assets to TX Rhino Rush.

44.    TX Rhino Rush is managed by Jesse McMullin, the same individual who caused Jeremy and Josh Swenson to sign the Transfer Documents.

45.    Any knowledge or information held by Jesse McMullin can be attributed to Raw Pharma, TX Rhino Rush and PandC.

46.    Immediately after the Transfer Documents were signed, Raw Pharma caused trucks to come to Rhino Rush located in Meridian, Idaho and begin loading inventory and equipment for transport to Raw Pharma's or TX Rhino Rush' location in Texas.  By Friday, March 15, 2019, Raw Pharma had already sent four semi-truck loads of inventory and equipment to Texas.

47.    On Friday, March 15, 2019, after demand was made by Rhino Rush to pay for the assets that had been taken, Raw Pharma and/or TX Rhino Rush, through its attorney, agreed not

to liquidate or transfer any further assets.  This agreement was meant to be in place while the parties negotiated a resolution to the transfer issues.

48.    Notwithstanding this agreement, during the week of March 18, 2019, Raw Pharma and/or TX Rhino Rush shipped another truckload of inventory and equipment to Texas, and moved other inventory and equipment from the Rhino Rush location in Meridian, Idaho, to PandC's location in Boise, Idaho.

49.    Raw Pharma and/or TX Rhino Rush also took control of Rhino Rush's internet presence.  As of March 22, 2019, Rhino Rush's website (www.rhinorush.com) remained down, with a static placeholder page indicating that the "All New Rhino Rush" was coming soon.  See attached *Exhibit D*.

50.    Additionally, on Thursday, March 21, 2019, Raw Pharma and/or TX Rhino Rush caused a press release to be posted to Rhino Rush's Facebook page, indicating that it (or a Texas affiliate) had acquired the Rhino Rush products and were continuing to build the company and brand.  See attached *Exhibit E*.

51.    Raw Pharma has prohibited the Swensons from entering Rhino Rush's real property located in Meridian, Idaho, despite the fact that the Debtor is the lessee of the property and the lease has not been assigned or terminated.

52.    Raw Pharma and/or TX Rhino Rush has taken control of Rhino Rush's employees – requiring employees to sign new short-term agreements with Raw Pharma.  See attached *Exhibit F*.

53.    Raw Pharma and/or TX Rhino Rush has also prohibited current employees (which were the Debtors employees) from providing any information or documents to either of the Swensons or other Rhino Rush owners.

54.     At the time the Transfer Documents were signed, all orders which the Debtor had made for products from Raw Pharma had been paid as required.

55.     Accordingly, the only obligations owed by the Debtor to Raw Pharma at the time of the Transfer Documents were the ongoing order obligations under the terms of the Forbearance Agreement.

## FIRST CLAIM FOR RELIEF
## (INJUNCTIVE RELIEF)

56.     The Debtor filed its Chapter 11 Case on March 22, 2019, and is working towards the filing and confirmation of a Chapter 11 Plan.

57.     While the Debtor has not yet formulated the specific terms of its proposed Chapter 11 Plan, its intend to propose a Plan that will pay its creditors in a fair, equitable, and responsible manner, including appropriate limitations on the use and disposal of personal property assets and projections of its income and operations going forward.  The Debtor has already located substitute product suppliers and is working towards finalizing contracts with those suppliers.

58.     Continued dominion and control of the Rhino Rush business by Raw Pharma and/or TX Rhino Rush will have a huge and detrimental impact on Rhino Rush's ability to continue operating its business and reorganize.  The Debtor will remain able to propose and confirm a plan only with viable businesses supporting its income and reorganization.

59.     The Debtor has located substitute suppliers who can continue to provide product for Rhino Rush to sell and distribute, so the continued business is not dependent on a continued relationship with Raw Pharma.

60.     Based on Raw Pharma's and TX Rhino Rush's actions, and assertions of dominion and control, Rhino Rush will not be able to successfully reorganize and all remaining creditors of Rhino Rush will be affected and remain unpaid.

61.     If the Court enters the requested injunctive relief, Raw Pharma would continue to retain the position it enjoyed prior to the time it coerced the Swensons into signing the Transfer Documents.

62.     The Debtor anticipates that its Chapter 11 Plan will adequately and fairly provide for Raw Pharma's allowed claim.

63.     The best option for Raw Pharma to be paid is through a confirmed Chapter 11 Plan, rather than through piecemeal sale of whatever assets it was able to collect after the Transfer Documents were signed.

64.     Absent the grant of injunctive relief, the Debtor is at risk of not confirming a Chapter 11 Plan, which would be a substantial hardship on the Debtor and all remaining creditors of the Debtor who would not be paid anything on their claims.

65.     Society at large, as well as the local economy in Ada County, Idaho, benefits from the successful reorganization of Chapter 11 debtors.

66.     The interests of <u>all</u> of Debtor's creditors are better served by the entry of the requested injunctive relief.

### <u>SECOND CLAIM FOR RELIEF</u><br><u>(RECOVERY OF PREFERENCE TRANSFER)</u>

67.     The Debtor reasserts all of the foregoing paragraphs as if fully set forth herein.

68.     The Transfer Documents were signed on or around March 11, 2019, which is within ninety days prior to the Petition Date.

69.     The transfer of assets allegedly caused by the Transfer Documents was a "transfer" within the meaning of 11 U.S.C. §§ 101(31) and 547(b) (the "Transfer").

70.     The Transfer consisted of transfer of property in which the Debtor had an interest.

71.     The Transfer of the property interest to Raw Pharma was made for or on account of unsecured antecedent debts owed by the Debtor to Raw Pharma before the Transfer was made.

72.     The Transfer was made while the Debtor was insolvent.

73.     The Transfer enabled or would enable Raw Pharma to receive (i) more than it would receive under Chapter 7 of the Bankruptcy Code, (ii) if the Transfer had not been made, and (iii) had Raw Pharma received payment of such debts to the extent provided by the Bankruptcy Code as unsecured creditors.

74.     Pursuant to 11 U.S.C. §550(a)(1) the Debtor may recover the transferred assets from Raw Pharma as the initial transferee or the entity on whose behalf the transfers were made.

75.     Pursuant to 11 U.S.C. §550(a)(2) the Debtor may recover the transferred assets, or the value of the transferred assets, from TX Rhino Rush as the immediate transferee of Raw Pharma (the initial transferee).

76.     Because of TX Rhino Rush's knowledge, through Jesse McMullin, of the method by which Raw Pharma obtained the transferred assets, and the fact that TX Rhino Rush did not pay any value to Raw Pharma for the assets is presently holds, and TX Rhino Rush's knowledge of, or knowledge it should have had of, the avoidability of the transfer of the assets to Raw Pharma, TX Rhino Rush is not a transferee described in 11 U.S.C. §550(b)(1).

77.     As a direct and proximate result of the foregoing, the Debtor is entitled to an order avoiding and preserving the Transfer to Raw Pharma for the benefit of the Debtor's bankruptcy estate, pursuant to 11 U.S.C. §§ 547, 550, and 551.

### THIRD CLAIM FOR RELIEF
### (RECOVERY OF FRAUDULENT TRANSFER)
### (Alternative to Claim Two)

78.     The Debtor realleges all of the foregoing paragraphs as if fully set forth herein.

79.     Within 90 days of the filing of the bankruptcy petition, the Swensons signed the Transfer Documents, which transferred the Debtor's assets to Raw Pharma.

80.     At the time the Transfer Documents were signed, the Debtor was current on outstanding and due obligations to Raw Pharma and did not owe Raw Pharma significant amounts.

81.     The Debtor, and by extension its creditors, did not receive reasonably equivalent value for the Transfer.

82.     At the time the Transfer occurred, (a) the Debtor was insolvent, or became insolvent as a result of the transfers; (b) the Debtor was engaged in business (or about to engage in business) for which its remaining assets were unreasonably small in relation to the Debtor's business and debts owed; or (c) the Debtor intended to incur, or believed it would incur, debts that would be beyond its ability to pay as such debts matured.

83.     The Transfer was fraudulent and are avoidable by the Debtor pursuant to 11 U.S.C. §548.

84.     Pursuant to 11 U.S.C. §550(a)(1) the Debtor may recover the transferred assets from Raw Pharma as the initial transferee or the entity on whose behalf the transfers were made.

85.     Pursuant to 11 U.S.C. §550(a)(2) the Debtor may recover the transferred assets, or the value of the transferred assets, from TX Rhino Rush as the immediate transferee of Raw Pharma (the initial transferee).

86.     Because of TX Rhino Rush's knowledge, through Jesse McMullin, of the method by which Raw Pharma obtained the transferred assets, and the fact that TX Rhino Rush did not pay any value to Raw Pharma for the assets is presently holds, and TX Rhino Rush's knowledge of, or knowledge it should have had of, the avoidability of the transfer of the assets to Raw Pharma, TX Rhino Rush is not a transferee described in 11 U.S.C. §550(b)(1).

87.     Pursuant to 11 U.S.C. §550(a)(2) the Debtor may recover the transferred assets from TX Rhino Rush and/or Does 1-25 as the immediate transferees of the initial transferee, Raw Pharma.

*(Verification page to follow)*

## <u>VERIFICATION</u>

STATE OF IDAHO    )
                          ) ss:
County of Ada          )

     We, Jeremy and Josh Swenson, having reviewed the foregoing Complaint and the allegations made therein, verify that the allegations are true and correct to the best of our knowledge and that the exhibits to the Complaint are what they are stated to be.

                                    /s/
                          JEREMY SWENSON

SUBSCRIBED AND SWORN TO before me this 22nd day of March, 2019.

                           /s/ Megan A. Richmond
                          NOTARY PUBLIC FOR IDAHO
                          My Commission Expires: 3/2/2021

                                      /s/
                          JOSH SWENSON

SUBSCRIBED AND SWORN TO before me this 22nd day of March, 2019.

                           /s/ Megan A. Richmond
                          NOTARY PUBLIC FOR IDAHO
                          My Commission Expires: 3/2/2021

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Rhino Rush, LLC, prays for a judgment and injunction against Raw Pharma as follows:

1.      On Claim One, for an order enjoining Raw Pharma and/or TX Rhino Rush from further dominion and control over Rhino Rush's assets, and requiring Raw Pharma and TX Rhino Rush to return and account for any assets they acquired as a result of the Transfer Documents or as subsequent transferee(s);

2.      On Count Two, for an order, pursuant to 11 U.S.C. §§547 and 550, avoiding and recovering for the bankruptcy estate the transferred assets as preferential transfers, or, alternatively, awarding a money judgment against Raw Pharma, TX Rhino Rush and Does 1-25, jointly and severally, in an amount according to proof, but no less than $5,000,000.00;

3.      On Count Three, for an order, pursuant to 11 U.S.C. §§ 548 and 550, avoiding and recovering for the bankruptcy estate the transferred assets as fraudulent transfers or, alternatively, awarding a money judgment against Raw Pharma, TX Rhino Rush and Does 1-25, jointly and severally, in an amount according to proof, but no less than $5,000,000.00;

4.      For an award of costs and expenses, including attorney's fees, associated with bringing and prosecuting this adversary proceeding.  In the event of a default judgment, an award of attorney fees in the amount of $5,000.00 is reasonable.

5.      For such other and further relief as the Court may deem just and equitable.

DATED this 22nd day of March, 2019.


                                                    /s/ Matt Christensen
                                                    _____
                                                    MATTHEW T. CHRISTENSEN
                                                    Attorney for Plaintiff/Debtor

# EXHIBIT A

## FORBEARANCE AGREEMENT AND FIRST AMENDMENT TO
## MANUFACTURING AND SUPPLY AGREEMENT

October 25, 2017

Rhino Rush, LLC
Attn: Josh Swenson
625 South Stratford Dr., Ste. 200
Meridian, ID 83642

Dear Mr. Swenson:

The parties to this Forbearance Agreement and First Amendment to Manufacturing and Supply Agreement (this "**Forbearance Agreement**") are Raw Pharma, LLC, a Utah limited liability company ("**Supplier**"), and Rhino Rush, LLC, an Idaho limited liability company ("**Customer**"). This Forbearance Agreement's effective date is July 1, 2017 (the "**Effective Date**").

### BACKGROUND

A.    Supplier and Customer entered into a Manufacturing and Supply Agreement dated October 30, 2014 (the "**Agreement**"), which contains the restrictions, covenants and promises between the parties relating to their business relationship.

B.    Customer contractually agreed to purchase 4,000,000 units of Rhino Rush Energy Shots under the Agreement during the first 15 months of production, and an additional 650,000 units per calendar quarter thereafter. Customer also issued a non-cancellable purchase order dated July 27, 2016 (the "**2016-2017 Purchase Order**") for an additional 4,000,000 units to be purchased between August 1, 2016 through July 31, 2017. Customer acknowledges that it will be unable to meet its purchase obligations under the 2016-2017 Purchase Order, and has failed to purchase the required number of units under the Agreement.

C.    Due to the parties' ongoing, long-term relationship, Supplier is willing to forbear from exercising its remedies for these failures, and to modify the terms of the Agreement, and to provide Customer an opportunity to purchase Products on the terms and conditions set forth in this Forbearance Agreement. Customer also desires this forbearance and willingly enters into this modification and accepts the benefits and obligations set forth in this Forbearance Agreement.

D.    The parties further agree to expand their relationship by extending the term of the Agreement, and expanding the Products that Supplier will manufacture for Customer to ephedra-free energy shots, and energy drinks.

### AGREEMENT

The parties agree as follows:

1. **Terms Usage**. Unless otherwise defined in this Forbearance Agreement, capitalized terms used herein will have the same meaning given them in the Agreement.

2. **Acknowledgment Concerning Shortfall.** The parties hereby agree and acknowledge that Customer has failed (and respecting the 2016-2017 Purchase Order, and ongoing quarterly minimum obligations under the Agreement, will fail) to pay Supplier $1,610,560.57 (the "**Shortfall**") as set forth in the table below, which the parties agree is due and owing under the Agreement and the 2016-2017 Purchase Order:

| Start date | End date | Total shots purchased | Total Obligation | Shortfall | Price during period | Revenue shortfall | |
|---|---|---|---|---|---|---|---|
| 1-May-16 | 31-Jul-16 | 0 | 650,000 | 650,000 | $ 0.6215 | $ | 403,975.00 |
| 1-Aug-16 | 31-Jul-17 | 2,850,354 | 4,000,000 | 1,149,646 | $0.6481 | $ | 745,085.57 |
| 1-Aug-17 | 31-Oct-17 | 0 | 650,000 | 650,000 | $0.71 | $ | 461,500.00 |
| | | | | | Total: | $ | 1,610,560.57 |

3. **Forbearance.** On the condition that Customer fulfills its obligations under the terms and conditions of this Forbearance Agreement, Supplier hereby agrees to forbear exercising its remedies due to these failures. The forbearance granted in this section does not and will not require that Supplier forbear from exercising its remedies relating to the Shortfall, or in the future should Customer fail to perform under the Agreement, the Forbearance Agreement, or any purchase order or other agreement between the parties.

4. **Invoices and Payments**. Section 3.03 of the Agreement is deleted in its entirety and is replaced by the following:

   "**Section 3.03**. Invoices and Payments. Supplier will issue its invoices to Customer with respect to each Product delivery. Customer will pay for Product each week within four (4) days after each delivery of Product. Customer will notify Supplier within ten (10) days after it discovers any inaccuracy in any payment or invoicing, and the Parties will work together in good faith to resolve any such discrepancy. For any Products ordered January 1, 2020 or thereafter, should Customer not place a blanket purchase order during each period this Agreement is effective between January 1 and December 31 of the following year (each a "**Contract Year**") for at least 3,000,000 Product units, Customer will be required to pay 50% of the Price of each individual order at the time of the Order, and the remaining 50% within four (4) days after each delivery of Product."

5. **Projections.** Section 2.03 is deleted entirely and replaced with the following:

   "**Section 2.03** Projections. Not later than 45 days before the beginning of each quarter during the Contract Year (quarters beginning in January, April, July, and October), Customer must provide its best quarterly and weekly forecast of the quantity and type of all Products (including flavor for each) it desires that Supplier manufacture for Customer, for the upcoming 12 months (each an "**Annual Rolling Projections**"). The forecast will constitute a binding commitment to place an Order for the quantities of Product units for

the immediately upcoming quarter (the "**Quarterly Projection**"), but will not be binding for the other three quarters in the forecast."

6. **Packaging and Shipping**. Section 5.06 is deleted in its entirety and replaced with the following:

"**Section 5.06**  Packaging and Shipping. Customer will pay Supplier for boxing, crating, recycling, bracing, shrink sleeves, cans, box trays, in-store displays, and other packaging materials (collectively "**Packaging Materials**") ordered by Supplier to be used for Products, and any costs to package and ship Product. Pricing of Packaging Materials is set forth on Exhibit B. Customer may be billed separately for Packaging Materials and will pay Supplier within four (4) days of Customer's receipt of each invoice for Packaging Materials. Customer will be responsible to regularly review Packaging Materials inventory levels with Supplier, expiration dates for Packaging Materials, and to place Packaging Materials Orders with sufficient lead times to meet Minimum Annual Volumes, Minimum Quarterly Volumes, Minimum Weekly Volumes, and all binding Orders. Customer will be responsible to pay Supplier for all Packaging Materials that expire or become unusable,"

7. **Products Expansion.** The parties agree to delete Exhibit A to the Agreement, and replace it with a new Exhibit A, which is attached hereto as Schedule 7.01. As new Products are added, the parties will work together in good faith to determine pricing, lead times for new equipment, and Packaging Materials costs, and other details concerning production, minimum volumes, and scheduling.

8. **Revised Volume Commitment.**  The final four sentences of Section 2.02 of the Agreement are hereby deleted entirely, and are replaced with the following:

"At the beginning of each Contract Year, Customer will issue to Supplier a non-cancellable purchase order of at least 3,000,000 Product units (the "**Minimum Annual Volume**"). Following Customer's full payment for the 2020 order, the Minimum Annual Volume requirement is hereby waived. Customer will purchase the Minimum Annual Volume at a minimum quarterly volume of 650,000 Product units (the "**Minimum Quarterly Volume**"). Once Customer has fulfilled the Minimum Annual Volume for a Contract Year, the Minimum Quarterly Volumes for the remainder of that Contract Year are waived. Beginning June 5, 2017 through December 31, 2020, Customer will purchase Product units from Supplier also in minimum weekly quantities (the "**Minimum Weekly Volume**") as follows:

| Weekly Minimum Volume | Week Beginning/End Date (all dates in this table refer to the year 2017) |
|---|---|
| 50,000 units | 4 calendar weeks beginning June 5/July 2 |
| 75,000 units | 4 calendar weeks beginning July 3/July 30 |
| 88,000 units | 4 calendar weeks beginning July 31/August 27 |
| 100,000 units | 8 calendar weeks beginning August 28 / October 22 |
| 50,000 units | Each week thereafter beginning October 23 through the Agreement's expiration |

Once Customer has fulfilled a Minimum Quarterly Volume for a quarter, the Minimum Weekly Volume for the remainder of that quarter is waived. Likewise, once Customer has fulfilled a Minimum Annual Volume for a Contract Year, the Minimum Weekly Volume for the remainder of that Contract Year is waived.

9. **Failure to Produce.** Section 5.02 is deleted in its entirety and is replaced with the following:

"**Section 5.02** Failure to Produce. If Supplier is unable to meet a weekly Order through no fault of Customer, Supplier will advise Customer, as soon as practicable of the earliest possible delivery date. If an Order has been timely delivered to Supplier and does not exceed Quarterly Projections for that weekly period, or Supplier is unable to deliver Product due to Force Majeure (as set forth in Article VI hereof) or fails to perform in accordance with this Agreement ("**Undelivered Product**"), then Supplier may (but is not obligated to) outsource Product manufacturing in order to replace the Undelivered Product, and Supplier will cover any additional outsourcing cost. If the Undelivered Product exceeds Quarterly Projections for that weekly period, Customer will be responsible for additional outsourcing cost (if Customer elects to outsource manufacturing of the Undelivered Product).

10. **Price.**

    a. Section 3.01 of the Agreement is hereby deleted in its entirety and replaced with the following:

    "**Section 3.01 Price.** Pricing will be as set forth on <u>Exhibit B</u> to this Agreement. "

    b. The parties agree to delete <u>Exhibit B</u> to the Agreement, and replace it with a new <u>Exhibit B</u>, which is attached hereto as <u>Schedule 3.01</u>.

11. **Late Payments**. Section 3.04 is hereby deleted in its entirety, and is replaced with the following:

"**Section 3.04.** Late Payments. Customer acknowledges that Supplier has made financial commitments to lenders, materials suppliers, employees, investors, and others, and is relying on timely payment from Customer for each batch of Products made for Customer. Therefore, Customer agrees that any amount due hereunder that is not paid when due will automatically accrue interest from the date due at a rate of .05% per day, compounded monthly. The payment of such interest will not limit Supplier from exercising any other rights it may have as a consequence of such late payment."

12. **Termination**. Section 7.02(a) is deleted in its entirety and replaced with the following:

"(a) Supplier may terminate this Agreement if Customer fails to make full payment due under any invoice more than fourteen (14) calendar days after its due date, or if during a Contract Year Customer is, in the aggregate, more than 45 days late in making payments for Products;".

13. **Security Agreement**. In further consideration of the forbearance in Section **Error! Reference source not found.** above, and to secure the payment of the Shortfall and

existing and future obligations, Customer agrees to grant to Supplier a security interest in all its assets, in the security agreement (the "**Security Agreement**") in the form attached as <u>Schedule 13.01</u>.

**14. License of Product Formulae.**

    a. **License Grant**. The parties acknowledge that the formula that Supplier is currently using to make energy shot Products (the "**Base Formula**") was developed by and is currently owned exclusively by Supplier. Should Customer timely fulfill its weekly purchase (and related payment) obligations under Section 8 above through March 1, 2018 (the "**License Conditions**"), and subject to Supplier's reservation of rights in Section 14(c) below, Customer will automatically be granted an exclusive, royalty-free, non-transferable (except to a purchaser of substantially all Customer's assets), perpetual (subject to early termination as set forth below) license to use the Base Formula to manufacture (i) Rhino Rush energy shots (2 oz.), (ii) Rhino Rush energy drinks (16 oz.), (iii) Rhino Rush pre-workout powder, and (iv) Rhino Relax shot (2 oz.) (all subject to Customer's requirements obligations to Supplier under Section 2.01 of the Agreement) under the "Rhino Rush" trademark (the "**License**"). Within 30 days after its satisfaction of the License Conditions, Supplier will in writing provide the Base Formula to Customer. Supplier's grant of licenses for future products will be in good faith discussed and agreed between Customer and Supplier.

    b. **Termination of License.** The License will terminate on the occurrence of any of the following:

        i. If Customer fails to satisfy the conditions set forth in Section 5, or otherwise fails to perform any of its material obligations (including those under Section 7.02) under the Agreement, this Forbearance Agreement, or the Security Agreement; or

        ii. If Customer (or any permitted assignee) becomes or is declared insolvent, makes a general assignment for the benefit of creditors, suffers a receiver to be appointed for it, enters into an agreement for the composition, extension or readjustment of all or substantially all of its obligations, files a voluntary petition in bankruptcy, or has an involuntary petition in bankruptcy filed against it which is not dismissed with prejudice within sixty (60) days after its filing.

    c. **Patented Ingredient.** Customer acknowledges that the Base Formula contains as an ingredient Patent Application No. P2392.10001US02 (the "**Patented Ingredient**"), and that nothing in this Agreement will prohibit Supplier from using the Patented Ingredient in any manner.

    d. **Transferability**. The License may not be transferred by Customer without Supplier's consent, until a permitted sale (under Section 15 below) occurs.

**15. Sale Restriction**. The parties acknowledge that Supplier and Customer have worked closely together to develop Customer's business and that Supplier has made significant capital investments and foregone the opportunity to manufacture products for Customer's competitors. Therefore, Customer agrees that it will not under any circumstances permit

Josh or Jeremy Swenson's combined equity in Customer to drop below 50.1%, except in the following circumstances:

    a. After January 1, 2022, on the condition that Customer has received delivery of, and Supplier has received full payment for, not less than 21,000,000 units of Energy Drink Products and Energy Shot Products.

    b. Anytime after January 1, 2025, regardless of the number of units of Energy Drink Products and Energy Shot Products that have been sold.

Any sale or transfer otherwise will be void.

16. **Extension.** In consideration of Supplier's forbearance under Section 3 above, the parties agree that Supplier will be the exclusive manufacturer and supplier of all goods sold by Customer (including the Products), through December 31, 2029.

17. **Confidentiality**. The words "two (2) years" in the first sentence of Section 9.02(c) are replaced with "seven (7) years", and the following sentence is added at the end of Section 9.02(c): "Notwithstanding the duration specified at the beginning of this subsection, if any of the Confidential Information is a trade secret under applicable law, the Recipient will hold this information in confidence for so long as it qualifies as a trade secret under applicable law."

18. **Acknowledgment**. Customer hereby agrees and acknowledges that Supplier has fully performed all its obligations under the Agreement through the Effective Date.

19. **Survival**.  Except as modified in this Forbearance Agreement, the terms of the Agreement remain unaffected.

Very truly yours,

RAW PHARMA, LLC

By: _____

Title: _____CFO_____

Date: ____6/26/17_____

AGREED AND ACKNOWLEDGED:

RHINO RUSH, LLC

By: _____

Title: _____

Date: _____

**SCHEDULE 3.01**

**EXHIBIT B**

**PRICING**

The Price for all Products will be as set as follows for each relevant time period:

(a) From the Effective Date through July 31, 2016, the Price for each Energy Shot Product unit will be $.6215 per unit.

(b) From August 1, 2016 through July 31, 2017, the Price for each Energy Shot Product unit will be $.6481 per unit.

(c) After July 31, 2017 (subject to Price adjustments described in this Agreement):

      (i) the Price for each Energy Shot Product unit will be $.5881 (excluding Packaging Materials which will be invoiced at $0.06 per unit ordered in the minimum Packaging Materials quantities of 320,000), based on the Minimum Annual Volume. Prices may be increased annually based on (i) Customer's failure to meet the Minimum Annual Volume (in addition to other relief available to Supplier), and (ii) increases in Supplier's total business costs and expenses (including raw materials, testing, manufacturing expenses, equipment, rent, insurance, employee costs, royalties and licensing expenses, and so forth).

      (ii) the Price for each 16 oz. Energy Drink Product unit will be $0.52 (excluding Packaging Materials which will be invoiced at $0.20 per unit ordered in the minimum Packaging Materials quantities of 120,000), based on the Minimum Annual Volume. Prices may be increased annually based on (i) Customer's failure to meet the Minimum Annual Volume (in addition to other relief available to Supplier), and (ii) increases in Supplier's total business costs and expenses (including raw materials, testing, manufacturing expenses, equipment, rent, insurance, employee costs, royalties and licensing expenses, and so forth).

(d) To enable Supplier to obtain volume pricing on raw materials, Customer may place additional non-cancellable blanket purchase orders of not less than 500,000 Product units for Products in excess of the Minimum Annual Volume. During each 12 month period from January 1 through December 31, starting with the period beginning January 1, 2018, the Price per unit delivered in excess of 3,000,000 will be reduced through a rebate incentive program, as follows:

| # of Delivered Units | Rebate (to be applied to volumes in excess of listed # of Delivered Units) |
|---|---|
| >3,000,000 | 5% |
| >4,000,000 | 6% |
| >5,000,000 | 7% |
| >6,000,000 | 8% |
| >7,000,000 | 9% |
| 8,000,000-10,000,000 | 12% |
| 10,000,000-12,000,000 | 16% |
| 12,000,000-15,000,000 | 20% |
| >15,000,000 | 25% |

The rebate program will not apply to Packaging Materials. Rebates owing will be paid within 30 days after the end of each Contract Year. If Customer defaults under the Agreement, any other agreement between the parties, or fails to take delivery of the committed volumes under a purchase order, Customer waives its right to any Price rebate that has not been paid at the time of the default.

**SCHEDULE 7.01**

**EXHIBIT A**

**PRODUCTS**

- Rhino Rush Energy Shot liquid (with Ephedra): Grape, and five (5) additional flavors which will share the same ingredient profile as Grape with the exception of the flavor profile
- Rhino Rush Energy Shot liquid (without Ephedra): Any three (3) flavors which will share the same ingredient profile with the exception of the flavor profile
- Energy drinks—to be determined and agreed between Customer and Supplier

Specifications: to be defined and released to Customer within 30 days after product formulation completion

Specification Tolerance: Supplier is allowed a variance within FDA allowables for ingredients only

## SCHEDULE 13.01

## FORM OF SECURITY AGREEMENT

[see attached]

# EXHIBIT B

## SECURITY AGREEMENT

THIS SECURITY AGREEMENT is made effective October 26, 2017 (the "**Effective Date**"), between Raw Pharma, LLC, a Utah limited liability company ("**Raw Pharma**") conducting manufacturing operations in the state of Utah, and Rhino Rush, LLC, an Idaho limited liability company ("**Rhino Rush**"). For valuable consideration, Rhino Rush grants, assigns and pledges to Raw Pharma a security interest in all of Rhino Rush's right, title and interest in and to the Collateral to secure certain obligations to Raw Pharma and agrees that Raw Pharma will have the rights stated in this Agreement with respect to the Collateral, in addition to all other rights which Raw Pharma may have by law.

1. **DEFINITIONS**. The following words shall have the following meanings when used in this Agreement. Terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Utah Uniform Commercial Code (the "**Uniform Commercial Code**").

(a)     Collateral means the assets Rhino Rush described on Exhibit "A" attached hereto and incorporated by this reference.

(b)     Event of Default means and includes without limitation any of the events of default set forth below in the section titled "Events of Default."

(c)     MS Agreement means the Manufacturing and Supply Agreement dated October 30, 2014 between Raw Pharma and Rhino Rush, and any amendments thereto (including the Forbearance Agreement and Amendment to Manufacturing and Supply Agreement effective July 1, 2017 between the parties).

(d)     Obligations means all obligations of Rhino Rush to Raw Pharma under this Agreement and the MS Agreement.

2. **OBLIGATIONS OF RHINO RUSH**. Rhino Rush warrants and covenants to Raw Pharma as follows:

(a)     Organization. Rhino Rush is a limited liability company which is duly organized, validly existing, and in good standing under the laws of the State of Idaho.

(b)     Authorization. The execution, delivery, and performance of this Agreement by Rhino Rush have been duly authorized by all necessary action by Rhino Rush and do not conflict with, result in a violation of, or constitute a default under (a) any provision of its articles of incorporation, or bylaws, or any agreement or other instrument binding upon Rhino Rush or (b) any law, governmental regulation, court decree, or order applicable to Rhino Rush.

(c)     Perfection of Security Interest. Rhino Rush authorizes the filing by Raw Pharma of financing statements, and such other filings as may be required by state or federal law in connection with Rhino Rush's interest in the Collateral, and to take whatever other actions are reasonably requested by Raw Pharma to perfect and continue Raw Pharma's security interest in the Collateral. Raw Pharma may at any time, and without further authorization from Rhino Rush, file a carbon, photographic or other reproduction of any financing statements or of this Agreement for use as a financing statement. Rhino Rush will notify Raw Pharma no fewer than thirty (30) days before any change in (a) Rhino Rush's name including any change to the assumed business names of Rhino Rush, (b) the Rhino Rush's jurisdiction of organization, (c) the Rhino Rush's organizational structure from a corporation to any other entity structure, or (d) the sale, transfer of more than 20% of the equity ownership in Rhino Rush.

(d)    <u>Removal of Collateral</u>.  Rhino Rush will keep the Collateral (or to the extent the Collateral consists of intangible property such as accounts, the records concerning the Collateral) at Rhino Rush's address set forth herein, or at such other locations as are acceptable to Raw Pharma.  Rhino Rush may not remove the Collateral from its existing locations without Raw Pharma's prior written consent.

(e)    <u>Transactions Involving Collateral</u>.  Rhino Rush may not sell, or otherwise transfer or dispose of the Collateral.  Absent Raw Pharma's permission, Rhino Rush also may not pledge, mortgage, encumber or otherwise permit the Collateral to be subject to any lien, security interest, encumbrance, or charge, other than the security interest provided for in this Agreement.  All proceeds from any disposition of the Collateral will be held in trust for Raw Pharma and may not be commingled with any other funds.  Upon receipt, Rhino Rush will immediately deliver any such proceeds to Raw Pharma.

(f)    <u>Title</u>.  Rhino Rush represents and warrants to Raw Pharma that it holds good and marketable title to, or a valid leasehold interest in, the Collateral, free and clear of all liens, claims, rights and encumbrances except those created in connection with this Agreement.  No financing statement covering any of the Collateral is on file in any public office other than those which reflect the security interest created by this Agreement or to which Raw Pharma has specifically consented.  Rhino Rush will defend Raw Pharma's rights in the Collateral against the claims and demands of all other persons.

(g)    <u>Inspection of Collateral</u>.  Rhino Rush will use its best efforts to maintain all of Rhino Rush's rights under or with respect to the Collateral.  Raw Pharma and its designated representatives and agents will have the right to all reasonable times to examine, inspect, and audit the Collateral wherever located.

(h)    <u>Taxes, Assessments and Liens</u>.  Rhino Rush will pay when due all taxes, assessments and liens upon the Collateral, its use or operation, upon the Obligations.

(i)    <u>Compliance with Governmental Requirements</u>.  Rhino Rush shall comply with all laws, ordinances, rules and regulations of all governmental authorities, now or hereafter in effect, applicable to the ownership, production, disposition, or use of the Collateral.

3.    **RIGHT TO POSSESSION**.  Until the occurrence of an Event of Default, Rhino Rush may have possession and beneficial use of all the Collateral and may use it in any lawful manner not inconsistent with the MS Agreement and this Agreement, provided that Rhino Rush's right to possession and beneficial use shall not apply to any Collateral where possession of the Collateral by Raw Pharma is required by law to perfect Raw Pharma's security interest in such Collateral.  If Raw Pharma at any time has possession of any Collateral, whether before or after an Event of Default, Raw Pharma will be deemed to have exercised reasonable care in the custody and preservation of the Collateral if Raw Pharma takes such action for that purpose as Rhino Rush shall request or as Raw Pharma, in Raw Pharma's sole discretion, deems appropriate under the circumstances.  Raw Pharma is not required to take any steps necessary to preserve any rights in the Collateral against prior parties, nor to protect, preserve or maintain any security interest given to secure the Obligations.

4.    **EXPENDITURE BY RAW PHARMA**.  If not discharged or paid when due, Raw Pharma may (but shall not be obligated to) discharge or pay any amounts reasonably required to be discharged or paid by Rhino Rush under this Agreement, including without limitation all taxes, liens, security interests, encumbrances, and preserving the Collateral.  Raw Pharma also may (but shall not be obligated to) pay all reasonable costs for maintaining and preserving the Collateral.  All such expenditures incurred or paid by Raw Pharma for such purposes will then bear interest at the rate of 0.5% per month, compounded monthly, from the date paid by Raw Pharma to the date of repayment by Rhino Rush.  All

such expenses shall become a part of the Obligations and, at Raw Pharma's option, will be payable on demand. This Agreement also will secure payment of these amounts. Such rights shall be in addition to all other rights and remedies to which Raw Pharma may be entitled upon the occurrence of an Event of Default.

　　　　5.　　**EVENTS OF DEFAULT**. Each of the following will constitute an Event of Default under this Agreement:

　　　　　　(a)　　Default in the performance of any material obligation under the MS Agreement, including minimum volume purchase obligations, and timely payment of invoices; or

　　　　　　(b)　　A breach of any provision of this Security Agreement which is not cured within ten (10) days after written notice of such breach is given to Rhino Rush.

　　　　6.　　**RIGHTS AND REMEDIES ON DEFAULT**. If an Event of Default occurs under this Agreement, at any time thereafter, Raw Pharma will have all the rights of a secured party under the applicable Uniform Commercial Code. In addition and without limitation, if an Event of Default occurs, Raw Pharma may exercise any one or more of the following rights and remedies, subject to the requirements of applicable law:

　　　　　　(a)　　Accelerate Obligations. Raw Pharma may declare the entire Obligations immediately due and payable without notice.

　　　　　　(b)　　Assemble Collateral. Raw Pharma may require Rhino Rush to deliver to Raw Pharma all or any portion of the Collateral and other documents relating to the Collateral. Raw Pharma may require Rhino Rush to assemble the Collateral and make it available to Raw Pharma at a place to be designated by Raw Pharma. Raw Pharma also shall have full power to enter upon the property of Rhino Rush to take possession of and remove the Collateral.

　　　　　　(c)　　Sell the Collateral. Raw Pharma will have full power to sell, lease, transfer, or otherwise deal with the Collateral or proceeds thereof in its own name or that of Rhino Rush. Raw Pharma may sell the Collateral at public auction or private sale. All expenses relating to the disposition of the Collateral will become a part of the Obligations secured by this Agreement and be payable on demand with interest at the rate of 0.5% per month, compounded monthly, from date of expenditure until repaid.

　　　　　　(d)　　Appoint Receiver. To the extent permitted by applicable law, Raw Pharma will have the following rights and remedies regarding the appointment of a receiver: (a) Raw Pharma may have a receiver appointed as a matter of right, (b) the receiver may be an employee of Raw Pharma and may serve without bond, and (c) all fees of the receiver and his or her attorney will become part of the Obligations secured by this Agreement and be payable on demand, with interest at the rate of 0.5% per month, compounded monthly, from date of expenditure until repaid.

　　　　　　(e)　　Collect Revenues and Accounts, Apply Accounts. Raw Pharma, either itself or through an agent, may collect the payments, rents, income, and revenues from the Collateral. Raw Pharma may at any time in its discretion transfer any Collateral into its own name or that of its nominee and receive the payments, rents, income, and revenues therefrom and hold the same as security for the Obligations or apply it to payment of the indebtedness in such order or preference as Raw Pharma may determine. Raw Pharma may exercise its rights to collect accounts and to notify account debtors to make payments directly to Raw Pharma for application to the Obligations without prior notice to Rhino Rush.

(f) Obtain Deficiency. If Raw Pharma chooses to sell any or all of the Collateral, Raw Pharma may obtain a judgment against Rhino Rush for any deficiency remaining on the Obligations due to Raw Pharma after application of all amounts received from the exercise of the rights provided in this Agreement.

(g) Other Rights and Remedies. Raw Pharma shall have all the rights and remedies of a secured creditor under the provisions of the Uniform Commercial Code, as may be amended from time to time. In addition, Raw Pharma shall have and may exercise any or all other rights and remedies it may have available at law, in equity, or otherwise.

(h) Cumulative Remedies. All of Raw Pharma's rights and remedies, whether evidenced by the MS Agreement, this Agreement, or by any other writing, shall be cumulative and may be exercised singularly or concurrently. Election by Raw Pharma to pursue any remedy will not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Rhino Rush under this Agreement, after Rhino Rush's failure to perform, will not affect Raw Pharma's right to declare a default and to exercise its remedies.

7. **MISCELLANEOUS PROVISIONS**. The following miscellaneous provisions are a part of this Agreement:

(a) Amendments. This Agreement, together with the MS Agreement, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. No alteration of or amendment to this Agreement will be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

(b) Applicable Law. This Agreement has been delivered to Raw Pharma and accepted by Raw Pharma in the State of Utah. If there is a lawsuit, Rhino Rush agrees to submit to the exclusive jurisdiction of the courts located in Salt Lake County, State of Utah. This Agreement is governed by and construct in accordance with the laws of the State of Utah.

(c) Attorneys' Fees Expenses. In the event of a default, Rhino Rush agrees to pay upon demand all of Raw Pharma's costs and expenses, including reasonable attorneys' fees and Raw Pharma's legal expenses, incurred in connection with the enforcement of this Agreement, the MS Agreement and other documents, whether or not a lawsuit is filed.

(d) Caption Headings. Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or defend the provisions of this Agreement.

(e) Notices. All notices required to be given under this Agreement shall be given in writing, may be sent by facsimile, and shall be effective (i) when actually delivered or (ii) when deposited with a nationally recognized overnight courier for delivery on the next succeeding business day or (iii) when deposited in the United States mail, first class, postage prepaid, registered or certified, return receipt requested, addressed to the party to whom the notice is to be given at the address set forth herein, three (3) business days following such deposit. Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address.

(f) Power of Attorney. Effective from and during the continuance of an Event of Default under Section 5, Rhino Rush hereby appoints Raw Pharma as its true and lawful attorney-in-fact, irrevocably, with full power of substitution to do the following: (a) to execute such financing statements and such other filings as may be required by state or federal law to perfect and continue Raw Pharma's

-4-

security interest in the Collateral, and (b) following an Event of Default: (i) to demand, collect, receive, receipt for, sue and recover all sums of money or other property which may now or hereafter become due, owning or payable from the Collateral; (ii) to execute, sign and endorse any and all claims, instruments, receipts, checks, drafts or warrants issued in payment for the Collateral; (iii) to settle or compromise any and all claims arising under the Collateral, and, in the place and stead of Rhino Rush, to execute and deliver its release and settlement for the claim; and (iv) to file any claim or claims or to take any action or institute or take part in any proceedings, either in its own name or in the name of Rhino Rush, or otherwise, which in the discretion of Raw Pharma may seem to be necessary to advisable. This power is given as security for the Obligations, and the authority hereby conferred is and shall be irrevocable and shall remain in full force and effect until renounced by Raw Pharma or until this Agreement expires.

(g)     Severability.  If a court of competent jurisdiction finds any provision of this Agreement to be invalid or unenforceable as to any person or circumstances, such finding shall not render that provision invalid or unenforceable as to any other persons or circumstances.

(h)     Successor Interest.  Subject to the limitations set forth above on transfer of the Collateral, this Agreement shall be binding upon and inure to the benefit of the parties, their successors and assigns.

(i)     Waiver.  Raw Pharma will not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Raw Pharma.  No delay or omission on the part of Raw Pharma in exercising any right may operate as a waiver of such right of any other right. A waiver by Raw Pharma of a provision of this Agreement will not prejudice or constitute a waiver of Raw Pharma's right otherwise to demand strict compliance with that provision or any other provision of this Agreement.  No prior waiver by Raw Pharma, or any course of dealing between Raw Pharma and Rhino Rush, will constitute a waiver of any of Raw Pharma's rights or of any of Rhino Rush's obligations as to any future transactions.

(j)     Duration and Expiration. The security interest granted in this Agreement will expire once the following conditions precedent have been satisfied: (a) three years after the Effective Date have passed, or Customer has received and paid for 21,000,000 units of Products (as that term is defined in the Forbearance Agreement), whichever is earlier, and (b) no Event of Default has occurred before this Agreement expires.

**RHINO RUSH ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS SECURITY AGREEMENT, AND AGREES TO ITS TERMS AS OF THE DATE SET FORTH ABOVE.**

RHINO RUSH, LLC

By:     _____

         Josh Swenson, President and CEO

RAW PHARMA, LLC:

By:     _____

         Mark Clark
         Vice President

5

EXHIBIT "A"

All assets of Rhino Rush, whether now owned or after-acquired, including without limitation the following:

All of Rhino Rush's right, title and interest in and to (a) all general intanglbles, including without limitation (i) all registered copyrights, designs, formulas and other works of authorship, including computer programs, source code and executable code, whether embodied in software, firmware or otherwise, documentation, records, data and maskworks; (ii) all inventions (whether or not patentable and whether or not reduced to practice), processes, patents and patent applications (including all reissues, divisions, continuations, continuations-in-part, extensions and reexaminations thereof); (iii) all proprietary and confidential information, trade secrets and know how; (iv) all databases, data compilations and collections and technical data; (v) all logos, trade names, trade dress, trademarks and service marks; (vi) all domain names, web addresses and sites; and (vii) all instantiations of the foregoing in any form and embodied in any medium, (b) all accounts, (c) all chattel paper, (d) all deposit accounts, (e) all instruments, (f) all inventory, (g) all investment property, (h) all equipment, and (i) all proceeds of the foregoing.

# EXHIBIT C



## POWER OF ATTORNEY OF
## RHINO RUSH, LLC
## DATED MARCH 1, 2019

The undersigned, Rhino Rush, LLC, an Idaho limited liability company (the "Company"), effective on the date specified in the title of this Power of Attorney, hereby irrevocably names, appoints and constitutes Jesse McMullin, Mark Clark, and Colin McMullin (each to individually exercise all the authorities and powers described herein), or such successor(s) or designee(s) as any of them may designate in his sole discretion or may be lawfully designated through the action of law (each a "Representative"), to be its true and lawful representative and attorney-in-fact, to act on behalf and in the name of the Company, to represent, manage and conduct all matters in connection with, necessary for or in relation to the transfer and assignment to Raw Pharma, LLC, Packaging and Container, LLC, ZUYA, LLC, or their affiliated companies (collectively "Raw Pharma"), of all of the Company's right, title and interest in and to the assets identified in Exhibit A attached (collectively the "Assets"), including the Rhino Rush® trademark and logo, including those identified on Exhibit B (the "Marks"), including, but not limited to, executing, acknowledging, filing and performing any and all agreements, instruments, certificates, certificates of title, acts, deeds, matters and businesses in·connection with, in relation to and on behalf of the Company, as the Representative (or the Representative's designee(s) and assign(s)) deems necessary and proper to effect the complete and final assignment and transfer of all the Collateral and enforcement of the Asset Transfer Agreement, the Ancillary Documents (as defined in the Asset Transfer Agreement), and the Agreements (as that term is also defined in the Asset Transfer Agreement) to Raw Pharma. The powers and authority granted to the Representative hereunder include the right (but not the obligation):

a) to act individually ·or through any other person or persons (including legal counsel) which the Representative may appoint for these purposes to represent the Company in any and all matters pertaining to obtaining title, possession, and control of the Assets, including the Marks, including signing any agreement, document, certificate, or the like, in the name of Rhino Rush, and Josh Swenson or Jeremy Swenson as its officers or directors, to support or enable Raw Pharma's exercise of its rights under this Asset Transfer Agreement;

b) to apply or arrange to apply for, prosecute, defend and transfer the Marks, any registrations therefor and all renewals thereof before any governmental or administrative authorities, including all invalidation, opposition, cancellation, reexamination, reissue, post-grant proceedings and appeals of any unfavorable decisions of the appropriate administrative authorities or courts;

c) to execute and record all documents, including powers of attorney, bills of sale, assignments, changes of name and changes of address, and to request certificates regarding the same, in each case as (and under the title of) an officer or manager of the Company and to cause the same to be notarized or legalized as necessary or appropriate;

1

d) to take any appropriate legal steps or actions the Representative deems fit against third parties that impair title to or infringe any of the Assets (including the Marks);

e) to obtain access, control and authority over any and all bank accounts in the name of Rhino Rush, LLC, including Account # 409001419, Zions First National Bank, Meridian, Idaho, and to change authorized signatories, withdraw funds, stop payments, and acquire all other authority respecting such account;

f) to defend any actions or legal proceedings commenced (or threatened to be commenced) by third parties against the Company or Raw Pharma in respect of the Assets;

g) to act as plaintiff or defendant in the event of claims or complaints concerning the Assets or to settle any dispute arising out of or in connection with the Assets;

h) to take all necessary actions and steps that may be necessary or proper for achieving the purposes set forth above, including but not limited to executing and filling any necessary applications, powers of attorney, instruments, deeds, claims and documents, in each case together with such notarial deeds, apostilles and other legalizations as may be necessary or appropriate under applicable law;

i) to appear and take all necessary actions and steps before any relevant governmental or administrative authorities;

j) to maintain the corporate existence and good standing of the Company, whether through the payment of any applicable franchise taxes, concession or filing fees that may be due or otherwise; and

k) to delegate these powers and authority in whole or in part to any other person(s), reserving the Representative's own authority.

This Power of Attorney will be of an perpetual duration. To the maximum extent permitted under applicable law, this Power of Attorney is coupled with an interest and is irrevocable. Without limiting the foregoing, this Power of Attorney will not be affected by any subsequent dissolution, termination or winding up of the Company for any reason.

*[Signature page follows]*

2

Executed this ___11___ day of March, 2019.

RHINO RUSH, LLC

Jeremy Swenson, Chief Technical Officer and Member

State of Idaho )
County of __Ada__ )

On this _11_ day of March, 2019, before me, _Michael B Howell_, a notary public, personally appeared
_Jeremy Swenson_____, proved to me on the basis of satisfactory evidence to be the person
whose name is subscribed to the within instrument, and acknowledged to me that he executed the same.

Seal

> MICHAEL B. HOWELL
> COMMISSION #2250
> NOTARY PUBLIC
> STATE OF IDAHO
> MY COMMISSION EXPIRES_____

Notary Public
My Commission Expires on _9/24/2021_

3

EXHIBIT A

ALL ASSETS OF RHINO RUSH, WHETHER NOW OWNED OR AFTER-ACQUIRED, INCLUDING WITHOUT LIMITATION THE FOLLOWING:

ALL OF RHINO RUSH'S RIGHT, TITLE AND INTEREST IN AND TO (A) ALL GENERAL INTANGIBLES, INCLUDING WITHOUT LIMITATION (I) ALL REGISTERED COPYRIGHTS, DESIGNS, FORMULAS AND OTHER WORKS OF AUTHORSHIP, INCLUDING COMPUTER PROGRAMS, SOURCE CODE AND EXECUTABLE CODE, WHETHER EMBODIED IN SOFTWARE, FIRMWARE OR OTHERWISE, DOCUMENTATION, RECORDS, DATA AND MASKWORKS; (II) ALL INVENTIONS (WHETHER OR NOT PATENTABLE AND WHETHER OR NOT REDUCED TO PRACTICE), PROCESSES, PATENTS AND PATENT APPLICATIONS (INCLUDING ALL REISSUES, DIVISIONS, CONTINUATIONS, CONTINUATIONS-IN-PART, EXTENSIONS AND REEXAMINATIONS THEREOF); (III) ALL PROPRIETARY AND CONFIDENTIAL INFORMATION, TRADE SECRETS AND KNOW HOW; (IV) ALL DATABASES, DATA COMPILATIONS AND COLLECTIONS AND TECHNICAL DATA; (V) ALL LOGOS, TRADE NAMES, TRADE DRESS, TRADEMARKS AND SERVICE MARKS; (VI) ALL DOMAIN NAMES, WEB ADDRESSES AND SITES; AND (VII) ALL INSTANTIATIONS OF THE FOREGOING IN ANY FORM AND EMBODIED IN ANY MEDIUM, (B) ALL ACCOUNTS, (C) ALL CHATTEL PAPER, (D) ALL DEPOSIT ACCOUNTS, (E) ALL INSTRUMENTS, (F) ALL INVENTORY, (G) ALL INVESTMENT PROPERTY, (H) ALL EQUIPMENT, AND (I) ALL PROCEEDS OF THE FOREGOING.

4

**EXHIBIT B**
**THE MARKS**

All trademarks and service marks registered with the United States Patent and Trademark Office, or used
by the Company, including the following:

USPTO Serial Number 86412757, Registration Number 4747390

## VOLUNTARY ASSET SURRENDER AND TRANSFER AGREEMENT

**THIS VOLUNTARY ASSET SURRENDER AND TRANSFER AGREEMENT** (this "**Asset Transfer Agreement**") is made effective 1 March 2019 (the "**Effective Date**"), by and between Rhino Rush, LLC, an Idaho limited liability company ("**Rhino Rush**") and Raw Pharma, LLC, a Utah limited liability company ("**Raw Pharma**").

### BACKGROUND

A.     Rhino Rush and Raw Pharma entered into a Manufacturing and Supply Agreement dated October 30, 2014 (the "**Agreement**") under which Rhino Rush agreed to buy, and Raw Pharma agreed to supply, energy shots under the Rhino Rush name and label. Rhino Rush did not fulfill its obligations under the Agreement. The parties then entered into a Forbearance Agreement and First Amendment to Manufacturing and Supply Agreement dated November 1, 2017 (effective July 1, 2017) (the "**Forbearance Agreement**"), under which Raw Pharma agreed to forbear exercising its remedies in exchange for Rhino Rush's commitment to timely pay invoices, and fulfill modified purchase obligations, among other things. In consideration of Raw Pharma's agreement to forbear exercising its remedies, the parties also entered into a Security Agreement dated November 1, 2017 (the "**Security Agreement**"), under which Rhino Rush pledged all of its assets to Raw Pharma to secure its obligations under the Forbearance Agreement. The Agreement, the Forbearance Agreement, and the Security Agreement may hereinafter be referred to collectively as the "Agreements".

B.     Rhino Rush has failed to timely pay invoices and meet other contractual obligations, and has accordingly breached the Agreements, thus entitling Raw Pharma to exercise all its remedies available under the Agreements and at law, including repossession of all of Rhino Rush's assets, termination of all product deliveries, acceleration of all obligations under the Agreements, and collection of a deficiency judgment against Rhino Rush and its management and shareholders.

C.     Rhino Rush desires that Raw Pharma not exercise all of its remedies under the Agreements and at law, but instead in order to satisfy its obligations, desires to cooperate and voluntarily transfer all its assets to Raw Pharma.

### AGREEMENT

The parties agree as follows:

1) **Terms Usage.** Unless otherwise defined in this Asset Transfer Agreement, capitalized terms used herein will have the same meaning given them in the Agreement.

2) **Representations and Warranties of Rhino Rush.** Rhino Rush hereby represents and warrants the following:

   a) Raw Pharma has fulfilled all of its obligations under Agreements, including providing any required notices, and is not in breach or default of any of the Agreements, as of the Effective Date.

   b) The Agreements are, as of the Effective Date of this Asset Transfer Agreement, legal, valid and binding on Rhino Rush, and Rhino Rush has no defense to their enforcement.

c) UCC Financing Statement #B 2017-1204675-3, dated 12/4/2017 and filed with the Idaho Secretary of State, is legal, valid and binding and was properly authorized by Rhino Rush to be filed by Raw Pharma.

d) Rhino Rush is an Idaho limited liability company, registered with the Idaho Secretary of State, and has been at all times since 1 November 2017.

e) Since 1 November 2017, Rhino Rush (a) has not borrowed money from anyone not a member of Rhino Rush, and represents and warrants that in connection with any such borrowing from members, Rhino Rush did not grant any security interest in any of the Collateral, (b) has not granted a security interest to any person or entity in any of the Collateral that currently exists or that was not terminated before January 1, 2019, and (c) has not authorized any person or entity to file a financing statement or otherwise take any action to perfect a security interest or lien in any Collateral since July 1, 2018.

f) During calendar year 2018, Rhino Rush failed to make full payment due under invoices for products delivered by Raw Pharma totaling 83 days late (including an allowance for any applicable grace periods). Since January 1, 2019, Rhino Rush failed to make full payment due under invoices for products delivered by Raw Pharma totaling 54 days late (including an allowance for any applicable grace periods). Rhino Rush's late payments were in breach of the Agreement, which caused it to default during calendar year 2018 and 2019, which entitles Raw Pharma to exercise all its remedies under the Agreements.

g) Rhino Rush has also failed to fulfill its other obligations under the terms of the Forbearance Agreement, and therefore Raw Pharma is entitled to, as of the Effective Date, pursue recovery of $1,965,189.97 (which includes accrued interest on that amount of 1% per month beginning November 1, 2017), plus all other amounts to which Rhino Rush was entitled and which were the subject of the conditional forbearance described in the Forbearance Agreement.

h) Due to Rhino Rush's breach of the Agreements, Rhino Rush acknowledges and agrees that Raw Pharma is entitled to accelerate its obligations under the Agreements, and Raw Pharma is entitled to recover from Rhino Rush an amount equal to $28,158,035.53 (the "**Calculated Damages**"), plus all other amounts available under the Agreements and at law and equity (the "**Other Costs and Damages**"), including attorneys' fees, costs of collection, and accrued and accruing contractual and pre-judgment and post-judgment interest (the Contract Damages and collectively, the "**Total Obligations**").

i) Due to Rhino Rush's breach of the Agreements, Raw Pharma's further performance of any of its obligations thereunder are excused and waived by Rhino Rush.

j) Rhino Rush failed to satisfy the conditions in the Forbearance Agreement that would have entitled it to obtain the License (as that term is defined in the Forbearance Agreement), and is therefore no longer entitled to obtain the License, and waives all rights in and to the License.

k) None of the Collateral are consumer goods or used as consumer goods, and none of Rhino Rush's obligations under the Agreements were created in connection with consumer goods.

l) All information contained in this Asset Transfer Agreement (including all schedules) is true and accurate.

m) Account Number 409001419, Zions First National Bank, Meridian, Idaho (the "**Bank Account**") is the only bank account that holds the funds of Rhino Rush or that receives customer payments, or other deposits, belonging to Rhino Rush.

3) **Proposal and Acceptance in Partial Satisfaction; Waivers.** Raw Pharma hereby proposes to Rhino Rush, and Rhino Rush hereby confirms receipt of such proposal, that it will accept the Collateral in satisfaction of two-thirds (2/3) of the Calculated Damages. Rhino Rush acknowledges receipt of such proposal, and hereby accepts, and agrees and consents to such proposal and waives any grace or waiting periods between the time of this proposal and Rhino Rush's acceptance thereof. Rhino Rush hereby

waives its rights (a) to object to the proposal, and under Idaho Revised Code Statutes Section 28-9-624, waives (i) all Rhino Rush's rights to require that Raw Pharma dispose of the Collateral, (ii) Rhino Rush's rights to redeem the Collateral, and (c) Rhino Rush's rights to receive any further notices of Raw Pharma's use and disposition of Collateral.

4) **Cooperation and Recovery of Assets.**

    a)   Rhino Rush will cause all of its officers, employees and shareholders to follow the directions of Raw Pharma and cooperate in the immediate transfer of title, possession, control and use of all the assets identified in Schedule 4(a) (the "**Collateral**") to Raw Pharma. Rhino Rush authorizes Raw Pharma to take any action Raw Pharma determines in its sole discretion are useful or appropriate in order to take possession of and use, or dispose of, the Collateral, and otherwise exercise its right and remedies under the Agreements, this Asset Transfer Agreement and the Ancillary Documents, and at law and equity.

5) **Collection and Removal of Tangible Collateral; Assignment of Certain Intangible Collateral.**

    a)   Rhino Rush will, within two calendar days after the Effective Date (a) provide to Raw Pharma in writing an accurate and complete list of the location of all of the Collateral, and (b) will gather and make available all tangible Collateral including equipment and inventory for removal by Raw Pharma at 3660 E Lanark St., Meridian, Idaho 83642 ("**RR Headquarters**") during the hours of 6 a.m. through 8 p.m. during the days of March 11 through March 31, 2019 (although it will make an effort to remove all Collateral before March 15); provided that intangible Collateral (including without limitation accounts receivable, deposit accounts, customer lists, contract rights, intellectual property rights, etc.) will also be turned over to Raw Pharma within the timeframe, and in the manner, set forth in this Asset Transfer Agreement and the Ancillary Documents, or as Raw Pharma may otherwise direct from time to time.

    b)   Rhino Rush agrees, contemporaneous with the signing of this Asset Transfer Agreement, to sign the bill of sale and general assignment in the form of Schedule 5(b) attached (the "**Bill of Sale**"), to effectuate the transfer of tangible collateral and certain intangible collateral other than those explicitly being transferred to Raw Pharma under the CTDN Assignment, including contract rights, software licenses and rights, social media accounts, customers and customer lists, and the like. Immediately upon signing of this Asset Transfer Agreement, Rhino Rush will provide to Raw Pharma's representatives a listing of all social media accounts and correct passwords.

6) **Intangible Asset Recovery.** Rhino Rush will comply with Raw Pharma's instructions and direction, and will cooperate to transfer all intangible Collateral to Raw Pharma, including as follows:

    a)   **Customers.** Rhino Rush will immediately provide Raw Pharma in writing all passwords and access codes to Rhino Rush's customer records management system, and will within 24 hours after the Effective Date print and give to Rhino Rush a full and complete customer list, including customer names, buyer/contact names associated with each customer, phone numbers, addresses, and notes regarding the customer. If a customer contacts Rhino Rush it will state that all accounts will be serviced by Raw Pharma now, but continuing under the Rhino Rush® brandname. Rhino Rush will cause its officers, directors and employees to assist Rhino Rush in ensuring a smooth transition of all customers to Raw Pharma..

    b)   **Letter to account debtors.** Rhino Rush consents to Raw Pharma signing Jeremy Swenson's name in behalf of Rhino Rush, and sending in behalf of Rhino Rush, the letter in substantially the form of Schedule 6(b) attached (the "**Account Debtor Letter**"), assigning all accounts receivable and payment rights to Raw Pharma, and notifying all customers of the Rhino Rush® brand name and account management transfer to Raw Pharma.

    c)   **UPC Transfer Letter.** Rhino Rush consents to Raw Pharma signing Jeremy Swenson's name in behalf of Rhino Rush, and sending in behalf of Rhino Rush, the letter in substantially the form of Schedule 6(c) attached (the "**UPC Letter**") transferring all UPC prefixes belonging to Rhino Rush to Raw Pharma.

d) **Copyright, Trademarks, and Domain Names Transfer**. Rhino Rush consents to Raw Pharma signing and sending, in behalf of Rhino Rush, the assignment in substantially the form of Schedule 6(d) attached (the "**CTDN Assignment**"), assigning trademarks, copyrights, and domain names to Raw Pharma.

e) **Bank Accounts**. Rhino Rush represents that Jeremy Swenson, the signor to this Agreement, has authority, acting individually, to add and remove account signors on the Bank Account. To ensure Raw Pharma's control over the funds being deposited in the Bank Account, immediately upon signing this Asset Transfer Agreement Raw Pharma may remove all signors and existing parties with control over the Bank Account, and add any and all of Raw Pharma's designees to be given full control over the Bank Account (including to designate additional signatories, approve or reject transactions, etc.).

f) **Power of Attorney**. Rhino Rush agrees to grant to Raw Pharma an irrevocable power of attorney in the form attached as Schedule 6(f) (the "**Power of Attorney**") to enable Raw Pharma to take any action it deems appropriate or necessary, including signing any agreement, document, certificate (including certificate of title to vehicles), or the like, in the name of Rhino Rush and Josh Swenson or Jeremy Swenson (as officers and members), to support or enable Raw Pharma's exercise of its rights under this Asset Transfer Agreement and the Ancillary Documents, including to transfer Collateral to Raw Pharma, to take possession, control of, or to use Collateral. Raw Pharma is entitled to recreate and use Rhino Rush letterhead for all purposes reasonably necessary to effectuate this Asset Transfer Agreement and the Ancillary Documents, in the form of letterhead attached as Schedule 6(b).

7) **Confidentiality; Publicity; Announcement; Non-disparagement.**

a) This Asset Transfer Agreement and Ancillary Documents are deemed the confidential information of Raw Pharma, and Rhino Rush may not disclose any part of them, or disclose their contents, to any third-party, except Rhino Rush may disclose the terms and conditions (i) to the extent necessary, to their professional advisors, attorneys, accountants, regulatory or taxing authorities, and (ii) under court order issued by a court of competent jurisdiction. Rhino Rush's officers and shareholders may share this Asset Transfer Agreement and the Ancillary Documents with his or her spouse or domestic partner. With respecting to employees, customers and suppliers, Rhino Rush may only inform them that (x) the issues and disputes between the Parties have been resolved, (y) that to resolve the issues between the Parties, Rhino Rush has turned over the Rhino Rush energy shot and energy drink assets to Raw Pharma due to defaults under the supply agreement between Rhino Rush and Raw Pharma, and (z) that customers and suppliers seeking to conduct energy shot and energy drink business should contact Raw Pharma to place orders.

b) Raw Pharma may place an announcement on the doors of RR Headquarters regarding its control and ownership of the Collateral, and make other public announcements in any other medium that it deems reasonable and appropriate, in its sole discretion.

c) Rhino Rush, its officers, members, representatives, and members of the families of the officer and members, may not at any time make, publish, or communicate to any person or entity or in any public forum any defamatory, malicious, or disparaging remarks, comments, or statements concerning Raw Pharma or its businesses, or any of its employees, officers, agents, shareholders, directors, suppliers, investors, existing and prospective customers, or other associated third parties, now or in the future.

8) **Indemnification**. Rhino Rush will indemnify, defend and hold Raw Pharma, its officers, employees, agents, attorneys, accountants, directors, shareholders, members, affiliated companies, and anyone else acting in Raw Pharma's behalf (collectively the "**Indemnitees**") harmless from all costs, claims, damages and expenses (including attorneys' fees) arising out of or related to Rhino Rush's (a) breach of this Asset Transfer Agreement or any of the agreements and documents referenced and attached in the schedules to this Asset Transfer Agreement (collectively the "**Ancillary Documents**"), and (b) any action by Rhino

Rush, its officers, employees, agents, attorneys, accountants, directors, shareholders, members, affiliated companies, and anyone acting in Rhino Rush's behalf (the "**RR Representatives**") to avoid the effects of this Asset Transfer Agreement or the Ancillary Documents, or that negatively impacts Raw Pharma, the Collateral, or Raw Pharma's ability to obtain the Collateral or otherwise obtain the benefits of this Asset Transfer Agreement.

9) **Insolvency**. Rhino Rush represents and warrants that on the day before the Effective Date, neither it nor the RR Representatives have taken, or will take, any action to attempt to void, reduce or limit the effect of this Asset Transfer Agreement or any of the Ancillary Documents, or to nullify them, including by filing a civil action or commencing any formal or informal proceeding (including commencing an insolvency proceeding), the intent or effect of which would be challenge or impact the validity or enforceability of this Asset Transfer Agreement, the Ancillary Documents, or any of the transactions contemplated or undertaken therein, nor will Rhino Rush allow or instruct any of the RR Representatives to take any such action.

10) **Authorization**. Signor individually represents and agrees that (a) he is the Chief Technical Officer and a voting member of Rhino Rush, (b) he has full authority to sign this Asset Transfer Agreement and the Ancillary Documents in behalf of Rhino Rush (including those requiring signature referred to in any schedule or exhibit), (c) that any required corporate action to sign and cause Rhino Rush to undertake the obligations and commit to the actions and releases referred to in this Asset Transfer Agreement and the Ancillary Documents, has been taken, (d) that neither this Asset Transfer Agreement nor any of the Ancillary Documents require any signature or approval other than that of the signor, and (e) that this Asset Transfer Agreement and the Ancillary Documents, and the transactions and obligations and waivers contemplated thereunder do not violate any law or breach any agreement to which Rhino Rush or its shareholders, officers, members, directors are a party.

11) **Personal Guaranty**. The obligations of Rhino Rush under this Asset Transfer Agreement and the Ancillary Documents will be personally guaranteed by Jeremy Swenson in accordance with the terms of the Guaranty attached as Schedule 11.

12) **Corporate Name; Trademark Restriction**. Raw Pharma may, at any time on or after the Effective Date, file with the Idaho Secretary of State a request to change the corporate name of Rhino Rush, LLC to a generic name that does not use the words "Rhino" or "Rush" or any variation thereof. Rhino Rush further agrees that, beginning on the Effective Date, it will not use the "Rhino Rush" trademark, logo, service mark, or any other trademark or logo that could be confused therewith. Rhino Rush authorizes Raw Pharma to request access to Rhino Rush's account with the Idaho Secretary of State (the "**SOS Account**"), and agrees that Raw Pharma is an authorized third party preparer for Rhino Rush who is entitled to access to Rhino Rush's SOS Account, and (c) Rhino Rush will approve any request that Raw Pharma be given a PIN for the SOS Account and will send such PIN to Raw Pharma within 24 hours after receiving it.

13) **Conditional Waiver of Deficiency Judgment**. On the later of (a) the 366th day after the Effective Date, and (b) one month after Raw Pharma is able to confirm through documentary evidence that Rhino Rush has fulfilled all of its obligations under this Asset Transfer Agreement and the Ancillary Documents, and has not breached any of the representations or warranties under the Asset Transfer Agreement and Ancillary Documents, Raw Pharma agrees to waive any deficiency judgment against Rhino Rush or its members, officers, directors, or employees, and the Guaranty will expire.

14) **Default and Remedies**. Should Rhino Rush breach any of its representations and warranties, or fail to fulfill any of its obligations, under this Asset Transfer Agreement or the Ancillary Documents, Rhino Rush will be deemed immediately to be in default (with no cure period or notice required from Raw Pharma). In that circumstance, Rhino Rush will be entitled to take the following actions:

   a) Raw Pharma may exercise all its remedies under this Asset Transfer Agreement, the Ancillary Agreements, and the Agreements;

   b) Raw Pharma may collect a deficiency judgment against Rhino Rush any member, officer, director, or employee of Rhino Rush; -

    c) Raw Pharma may pursue any other rights available at law or in equity;

    d) Raw Pharma may sign and file with a court of competent jurisdiction, in behalf of Jeremy
Swenson as guarantor and Rhino Rush as primary obligor, a confession of judgment using
confessing judgment by Rhino Rush in favor of Raw Pharma in the amount of any deficiency,
and consenting to specific enforcement of the Asset Transfer Agreement, the Guaranty, the
Agreements, and the Ancillary Documents.

## 15) Continuing Covenants.

    a) For five years following the Effective Date, neither Rhino Rush, its members, shareholders and
officers will:

        i) own any shares of, or act as an officer, member, employee, or agent of any company that sells
energy shots or energy drinks to retail or convenience stores, or (b) sell any product or service,
either directly or indirectly (for example, through a distributor or broker or sales representative)
to any convenience store; and

        ii) attempt to or actually induce, solicit, or encourage any customer of Rhino Rush to direct its
business to any competitor of Raw Pharma.

## 16) Miscellaneous.

    a) **Assignment**. Rhino Rush may not assign or transfer this Agreement or any part thereof, to any
third party. Any attempted assignment or transfer will be void. Raw Pharma may assign or
transfer this Agreement or any part thereof, to any of its, subsidiaries, affiliates, and successors.

    b) **Governing Law and Jurisdiction**. The substantive and procedural laws of the State of Texas
will govern this Asset Transfer Agreement and the Ancillary Documents. The state and federal
courts located in Plano, Texas will have exclusive jurisdiction for any proceedings relating to the
Asset Transfer Agreement and the Ancillary Documents.

    c) **Survival**. Regardless of the circumstances of termination or expiration of this Asset Transfer
Agreement, all sections and subsections of this Asset Transfer Agreement (other than those
which by their nature clearly do not extend beyond such termination or expiration) will survive
according to their terms.

    d) **Conflicts**: In the event of a conflict or inconsistency between this Asset Transfer Agreement, the
Agreements, and the Ancillary Documents, this Asset Transfer Agreement will control.

    e) **Severability**: Any section of this Asset Transfer Agreement that is prohibited or unenforceable
in any jurisdiction is, as to that jurisdiction, ineffective to the extent of such prohibition or
unenforceability and is severed from the balance of this Asset Transfer Agreement, all without
affecting the remaining sections of this Asset Transfer Agreement or affecting the validity or
enforceability of such sections in any other jurisdiction.

    f) **Time of Essence**: Time is of the essence in respect of the performance of Rhino Rush's
obligations under this Asset Transfer Agreement.

    g) **Attorneys' Fees**. Should Rhino Rush fail to perform any covenant or obligation under this Asset
Transfer Agreement, Raw Pharma will be entitled to recover all attorneys' fees and costs in
negotiating, enforcing and pursuing collection under it.

    h) **Entire Agreement and Waiver**: This Asset Transfer Agreement (and the Agreements and
Ancillary Documents, as well as other agreements and documents referenced herein) constitute
the entire agreement between the Parties with respect to the surrender and turnover of assets by
Rhino Rush to Raw Pharma, and supersede all other written or oral understandings or
agreements between the Parties with respect thereof. No variation or modification of this Asset
Transfer Agreement shall be valid unless an amendment in writing is signed by a duly authorized
officer of each party.

i) **Counterparts**: This Asset Transfer Agreement may be executed in one or more counterparts and may be delivered to each other party by facsimile or other electronic transmission, and upon receipt of same each of such counterparts shall be deemed to be taken together to constitute one and the same original document.

RAW PHARMA, LLC

By: _____

Title: _____

Date of Signature: 3/11/19

RHINO RUSH, LLC

By: _____

Name/Title: Jeremy Swenson, Chief Technical Officer and Member _____

Date of Signature: 3/11/19

APPROVED:

_____

Jeremy J. Swenson
Joshua

SCHEDULE 4(a)
COLLATERAL

ALL ASSETS OF RHINO RUSH, WHETHER NOW OWNED OR AFTER-ACQUIRED, INCLUDING WITHOUT LIMITATION THE FOLLOWING:

ALL OF RHINO RUSH'S RIGHT, TITLE AND INTEREST IN AND TO (A) ALL GENERAL INTANGIBLES, INCLUDING WITHOUT LIMITATION (I) ALL REGISTERED COPYRIGHTS, DESIGNS, FORMULAS AND OTHER WORKS OF AUTHORSHIP, INCLUDING COMPUTER PROGRAMS, SOURCE CODE AND EXECUTABLE CODE, WHETHER EMBODIED IN SOFTWARE, FIRMWARE OR OTHERWISE, DOCUMENTATION, RECORDS, DATA AND MASKWORKS; (II) ALL INVENTIONS (WHETHER OR NOT PATENTABLE AND WHETHER OR NOT REDUCED TO PRACTICE), PROCESSES, PATENTS AND PATENT APPLICATIONS (INCLUDING ALL REISSUES, DIVISIONS, CONTINUATIONS, CONTINUATIONS-IN-PART, EXTENSIONS AND REEXAMINATIONS THEREOF); (III) ALL PROPRIETARY AND CONFIDENTIAL INFORMATION, TRADE SECRETS AND KNOW HOW; (IV) ALL DATABASES, DATA COMPILATIONS AND COLLECTIONS AND TECHNICAL DATA; (V) ALL LOGOS, TRADE NAMES, TRADE DRESS, TRADEMARKS AND SERVICE MARKS; (VI) ALL DOMAIN NAMES, WEB ADDRESSES AND SITES: AND (VII) ALL INSTANTIATIONS OF THE FOREGOING IN ANY FORM AND EMBODIED IN ANY MEDIUM, (B) ALL ACCOUNTS, (C) ALL CHATTEL PAPER, (D) ALL DEPOSIT ACCOUNTS, (E) ALL INSTRUMENTS, (F) ALL INVENTORY, (G) ALL INVESTMENT PROPERTY, (H) ALL EQUIPMENT, AND (I) ALL PROCEEDS OF THE FOREGOING.

SCHEDULE 5(b)
BILL OF SALE AND GENERAL ASSIGNMENT

[SEE ATTACHED]

SCHEDULE 6(b)
NOTICE TO ACCOUNT DEBTORS
AND NOTIFICATION OF BRAND NAME TRANSFER

[SEE ATTACHED]

## SCHEDULE 6(c)
### PREFIX (UPC) TRANSFER LETTER

[SEE ATTACHED]

SCHEDULE 6(d)
COPYRIGHT, TRADEMARK AND DOMAIN NAMES TRANSFER AGREEMENT

[SEE ATTACHED]

SCHEDULE 6(f)
POWER OF ATTORNEY

[SEE ATTACHED]

SCHEDULE 11
PERSONAL GUARANTY

(SEE ATTACHED)

## GENERAL ASSIGNMENT AND BILL OF SALE

For good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, Rhino Rush, LLC, an Idaho limited liability company ("**Seller**"), does hereby grant, bargain, transfer, sell, assign, convey and deliver to Raw Pharma, LLC, a Utah limited liability company ("**Buyer**"), all of its right, title and interest in and to the following assets (collectively the "**Assets**"):

ALL ASSETS OF RHINO RUSH, WHETHER NOW OWNED OR AFTER-ACQUIRED, INCLUDING WITHOUT LIMITATION THE FOLLOWING:

ALL OF RHINO RUSH'S RIGHT, TITLE AND INTEREST IN AND TO (A) ALL GENERAL INTANGIBLES, INCLUDING WITHOUT LIMITATION (I) ALL REGISTERED COPYRIGHTS, DESIGNS, FORMULAS AND OTHER WORKS OF AUTHORSHIP, INCLUDING COMPUTER PROGRAMS, SOURCE CODE AND EXECUTABLE CODE, WHETHER EMBODIED IN SOFTWARE, FIRMWARE OR OTHERWISE, DOCUMENTATION, RECORDS, DATA AND MASKWORKS; (II) ALL INVENTIONS (WHETHER OR NOT PATENTABLE AND WHETHER OR NOT REDUCED TO PRACTICE), PROCESSES, PATENTS AND PATENT APPLICATIONS (INCLUDING ALL REISSUES, DIVISIONS, CONTINUATIONS, CONTINUATIONS-IN-PART, EXTENSIONS AND REEXAMINATIONS THEREOF); (III) ALL PROPRIETARY AND CONFIDENTIAL INFORMATION, TRADE SECRETS AND KNOW HOW; (IV) ALL DATABASES, DATA COMPILATIONS AND COLLECTIONS AND TECHNICAL DATA; (V) ALL LOGOS, TRADE NAMES, TRADE DRESS, TRADEMARKS AND SERVICE MARKS; (VI) ALL DOMAIN NAMES, WEB ADDRESSES AND SITES; AND (VII) ALL INSTANTIATIONS OF THE FOREGOING IN ANY FORM AND EMBODIED IN ANY MEDIUM, (B) ALL ACCOUNTS, (C) ALL CHATTEL PAPER, (D) ALL DEPOSIT ACCOUNTS, (E) ALL INSTRUMENTS, (F) ALL INVENTORY, (G) ALL INVESTMENT PROPERTY, (H) ALL EQUIPMENT, AND (I) ALL PROCEEDS OF THE FOREGOING.

to have and to hold the same unto Buyer, its successors and assigns, forever.

The definition of Assets hereunder includes all company books and records relating to the Assets, and all general intangibles, including without limitation all contract rights, domain names and URLs, social media accounts, passwords and account management rights, UPC codes and prefixes, and the like (including all those listed on <u>Exhibit A</u>). Seller represents and warrants that (1) Seller is conveying good and valid title to all Assets, free and clear of all encumbrances, debts, mortgages, attachments, pledges, charges, claims and liens of any kind; and (2) Seller has the right to sell the Assets to Buyer and will warrant and defend the right against the lawful claims and demands of all persons.

Seller for itself, its successors and assigns, hereby covenants and agrees that, at any time and from time to time upon the written request of Buyer, Seller will do, execute, acknowledge and deliver or cause to be done, executed, acknowledged and delivered, all such further acts, deeds, assignments, transfers, conveyances, powers of attorney and assurances as may be reasonably required by Buyer in order to assign, transfer, set over, convey, assure and confirm unto and vest in Buyer, its successors and assigns, title to the assets sold, conveyed and transferred by this Bill of Sale.

This Bill of Sale and Assignment is binding upon and inure to the benefit of the Assignor, Assignee and their respective successors and permitted assigns.

The law of the State of Texas will govern all questions concerning the construction, validity, interpretation and enforceability of this Bill of Sale and Assignment and the exhibits and schedules attached hereto, the determination of any contractual or non-contractual rights, duties or remedies of the parties arising out of or relating to this Assignment and the exhibits and schedules attached hereto, and the performance of the obligations imposed by this Assignment, without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of Texas or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Texas.

Whenever possible, each provision of this Assignment shall be interpreted in such manner as to be effective and valid under applicable Law, but if any provision of this Assignment or the application of any such provision to any Person or circumstance shall be held to be prohibited by or invalid, illegal or unenforceable under applicable Law in any respect by a court of competent jurisdiction, such provision shall be ineffective only to the extent of such prohibition or invalidity, illegality or unenforceability, without invalidating the remainder of such provision or the remaining provisions of this Assignment. Furthermore, in lieu of such illegal, invalid or unenforceable provision, there shall be added automatically as a part of this Assignment a legal, valid and enforceable provision as similar in terms to such illegal, invalid, or unenforceable provision as may be possible.

This Bill of Sale and Assignment is incorporated as part of the transaction documents contemplated by the Asset Transfer Agreement. Any provision of this Bill of Sale and Assignment may be waived or amended if, and only if, such amendment or waiver is in writing and signed by all of the parties. No failure by any party hereto to insist upon the strict performance of any covenant, duty, agreement or condition of this Assignment, or to exercise any right or remedy consequent upon a breach hereof, shall constitute a waiver of any such breach or any other covenant, duty, agreement or condition hereof.

This Bill of Sale and Assignment is for the sole benefit of the parties hereto, their permitted assigns and nothing herein expressed or implied shall give or be construed to give any person or entity, other than the parties hereto and such permitted assigns, any legal or equitable rights hereunder.

This Bill of Sale and Assignment may be executed in one or more counterparts (including by means of facsimile pdf or other electronic signature pages), all of which shall be considered one and the same agreement, and shall become effective when one or more such counterparts have been signed by each of the parties and delivered to the other party.

AGREED: RHINO RUSH, LLC

By: Jeremy Swenson, Chief Technical Officer and Member

APPROVED:

#89880763v5   Joshua J. Swenson

## EXHIBIT A
## SPECIFIC GENERAL INTANGIBLES

1. www.rhinorush.com, www.rhinorushllc.com
2. Rhino Rush product logo
3. Rhino Rush product packaging
4. Other product materials and product collateral
5. Social media sites, accounts and logins, including Instagram (rhinorushllc), Twitter (@rhinorushllc), Facebook (Rhino Rush LLC—http://m.facebook.com/RhinoRush/), LinkedIn (rhinorushllc)
6. All UPC codes and prefixes
7. All software programs, rights, applications and passwords, including accounting software (such as QuickBooks) and CRM software (such as Salesforce)
8. All other existing content created by Rhino Rush or its agents/representatives

#89880763v5

## COPYRIGHT, TRADEMARK AND DOMAIN NAME ASSIGNMENT AGREEMENT

This COPYRIGHT, TRADEMARK AND DOMAIN NAME ASSIGNMENT AGREEMENT (this "Assignment") is made effective 1 March 2019 (the "Effective Date") by and between Rhino Rush, LLC, an Idaho limited liability company ("Assignor") and Raw Pharma, LLC, a Utah limited liability company ("Assignee"). The Assignors and Assignee are sometimes herein referred to collectively as the "Parties" and individually as a "Party." Capitalized terms used but not defined herein shall have the meanings given to such terms in the Asset Transfer Agreement (as defined herein).

### BACKGROUND

A. Assignor is in the business of marketing and selling energy shots, energy drinks, and similar products (the "Business"), and uses websites, packaging designs, and other designs, drawings, word combinations, etc., which may or may not have been registered as copyrights with the United States Copyright Office, including those set forth on Exhibit A (collectively the "Copyrights").

B. Assignor also conducts the Business through the use of the trademarks and trademark applications, including those set forth in Exhibit B hereto (the "Marks").

C. Assignor also conducts the Business through the use of domain names, including those identified on Exhibit C (the "Domain Names") and is the registrant of the Domain Names with various domain name registrars as set forth therein, at times through privacy screen and other organizations that all have registered such Domain Names on the Seller's behalf.

D. The Parties have entered into that certain Asset Transfer Agreement effective March 1, 2019, under which the Assignor has agreed to assign all of its assets to Assignee (the "Asset Transfer Agreement"). Under the terms of the Asset Transfer Agreement the Assignor desires to assign all right, title and interest in and to the Copyrights, the Marks, and the Domain Names to Assignee, and Assignee desires to acquire same.

### AGREEMENT

The Parties agree as follows:

1.      Copyrights.

(a) The Assignor hereby sells, assigns, grants, and delivers to Assignee and Assignee hereby accepts, the entire right, title, and interest of every kind and nature whatsoever of the Assignor in and to the Copyrights, including: (a) all rights to obtain registrations, renewals, and extensions of the Copyrights, individually or collectively, that may be secured under the laws now or hereafter in force and effect in the United States, or in any other country or countries; (b) all rights of Assignor to sue for all past infringement, misappropriation or violation of the Copyrights, both at common law and under the statutes of the United States or any other country; and (c) all income, royalties, payments now or hereafter due or payable with respect thereto. The Assignor does further consent to the recordation of this Assignment with any governmental agency.

(b) Further Assurances. The Assignor hereby agrees, from and after the date hereof and without further consideration, to take such actions and execute such documentation as may be required by any domestic or foreign intellectual property registrar or regulatory agency to transfer ownership of the Copyrights from the Assignor to the Assignee. The Assignor hereby also agrees to execute such further assignments and related documents with respect to the Copyrights as Assignee shall reasonably request.

(c) Unassignable Rights. To the extent any of the Copyrights cannot presently be assigned under applicable law pursuant to this Assignment, the Assignor may not sell, assign or transfer to any third party or register or use in any manner (except to take necessary steps to obtain registration) the unassignable Copyrights or otherwise dispute or challenge Assignee's or its assignee's assignment, transfer, sale, registration or use of such unassignable Copyrights. In the event any such unassignable Copyright subsequently becomes assignable, the Assignor will promptly take all necessary action to assign such Copyrights to Assignee, upon request thereof by Assignee.

(d) Recordation. The Assignor hereby authorizes and requests the United States Copyright Office, or with respect to any foreign Copyrights, if any, the foreign equivalent as the case may be, to record Assignee as owner of the Copyrights and to issue any and all registrations, including renewals thereof, to Assignee, its successors, assigns, nominees or other legal representatives.

(e) Rights and Royalties. All rights and any income, royalties or payments otherwise due or payable to the Assignor with respect to any Copyrights as of the date hereof or thereafter, will be held and enjoyed by Assignee, its successors, executors and permitted assigns.

2.      Trademarks.

(a) The Assignor hereby irrevocably convey, transfer, assign, and deliver unto Assignee, and Assignee hereby accepts, absolutely and forever, their entire right, title, and interest in the United States and throughout the world, in and to the Marks, whether statutory or at common law, together with all goodwill arising from or related to the business symbolized by the Marks, the same to be held and enjoyed by Assignee, as successor to the business or portion of the business of Assignor to which the Marks pertain, which business is ongoing and existing, for its own use and enjoyment, and for the use and enjoyment of its licensees, successors, assigns, and/or other legal representatives, including the right to (a) all income, royalties and payments now or hereafter due or payable with respect thereto, (b) apply for, make filings with respect to and maintain all registrations, applications and renewals thereof, and (c) sue for and receive all damages accruing from past, present and future infringement, misappropriation or violation of the Marks and the right to fully and entirely stand in the place of Assignor in all matters related thereto, to be used as fully and entirely as such rights would have been held and enjoyed by each Assignor had this Assignment not been made.

(b) Further Assurances. The Assignor hereby agrees, from and after the date hereof and without further consideration, to take such actions and execute such documentation as may be required by any domestic or foreign intellectual property registrar or regulatory agency to transfer ownership of the Marks from the Assignor to Assignee. The Assignor hereby also agrees to execute such further assignments and related documents with respect to the Marks as Assignee shall reasonably request.

(c) Unassignable Rights. To the extent any of the Marks cannot presently be assigned under applicable law pursuant to this Assignment, the Assignor may not sell, assign or transfer to any third party or register or use in any manner (except to take necessary steps to obtain registration of unassignable Marks) the unassignable Marks or otherwise dispute or challenge Assignee's or its assignee's assignment, transfer, sale, registration or use of such unassignable Marks. In the event any such unassignable Mark subsequently becomes assignable, the Assignor shall promptly take all necessary action to assign such Marks to Assignee, upon request thereof by Assignee.

(d) Recordation. The Assignor hereby authorizes and requests the Commissioner of Patents and Trademarks of the United States of America, or with respect to any foreign trademarks or service marks or applications or registrations for such marks the foreign equivalent as the case may be, to record

Assignee as owner of the Marks and to issue any and all registrations, including renewals thereof, to Assignee, its successors, assigns, nominees or other legal representatives.

(e) Rights and Royalties. All rights and any income, royalties or payments otherwise due or payable to the Assignor with respect to any Marks as of the date hereof or thereafter, will be held and enjoyed by Assignee, its successors, executors and permitted assigns.

3.    Domain Names.

(a) Assignment. In consideration of the Purchase Price, the Assignor hereby irrevocably sells, assigns, transfers and conveys to Assignee all right, title and interest in and to the Domain Names, including the current registration thereof.

(b) Transfer of Domain Name. The Assignor will, as Buyer may request, without further consideration, execute all documents, papers, forms and authorizations, and take such other actions as are necessary to effectuate the transfer of ownership and control of the Domain Names to Assignee, and enable Assignee to register the Domain Names in Assignee's name with the domain name registry of Assignee's choosing.

(c) Unassignable Rights. To the extent any of the Domain Names cannot presently be assigned under applicable law pursuant to this Assignment, Assignor may not sell, assign or transfer to any third party or register or use in any manner (except to take necessary steps to obtain registration) the unassignable Domain Names or otherwise dispute or challenge Assignee's or its assignee's assignment, transfer, sale, registration or use of such unassignable Domain Names. In the event any such unassignable Domain Name subsequently becomes assignable, Assignor will promptly take all necessary action to assign such Domain Names to Assignee, upon Assignee's request.

4.    Successors and Assigns. This Assignment shall be binding upon and inure to the benefit of the Assignor, Assignee and their respective successors and permitted assigns.

5.    Headings. The article and section headings of this Assignment are for convenience of reference only and shall not be deemed to limit or affect any of the provisions hereof.

6.    Governing Law. The law of the State of Texas shall govern all questions concerning the construction, validity, interpretation and enforceability of this Assignment and the exhibits and schedules attached hereto, the determination of any contractual or non-contractual rights, duties or remedies of the parties arising out of or relating to this Assignment and the exhibits and schedules attached hereto, and the performance of the obligations imposed by this Assignment, without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of Texas or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Texas.

7.    Severability. Whenever possible, each provision of this Assignment shall be interpreted in such manner as to be effective and valid under applicable Law, but if any provision of this Assignment or the application of any such provision to any Person or circumstance shall be held to be prohibited by or invalid, illegal or unenforceable under applicable Law in any respect by a court of competent jurisdiction, such provision shall be ineffective only to the extent of such prohibition or invalidity, illegality or unenforceability, without invalidating the remainder of such provision or the remaining provisions of this Assignment. Furthermore, in lieu of such illegal, invalid or unenforceable provision, there shall be added automatically as a part of this Assignment a legal, valid and enforceable provision as similar in terms to such illegal, invalid, or unenforceable provision as may be possible.

8.    _Entire Agreement_.  This Assignment, the other transaction documents contemplated by the Asset Transfer Agreement, the Agreements, and the other agreements and documents referred to herein and therein contain the entire agreement and understanding between the parties hereto and thereto with respect to the subject matter hereof and thereof and supersede all prior agreements and understandings.

9.    _Amendments; No Waiver_.  Any provision of this Assignment may be waived or amended if, and only if, such amendment or waiver is in writing and signed by all of the parties.  No failure by any party hereto to insist upon the strict performance of any covenant, duty, agreement or condition of this Assignment, or to exercise any right or remedy consequent upon a breach hereof, shall constitute a waiver of any such breach or any other covenant, duty, agreement or condition hereof.

10.    _No Third Party Beneficiaries_.  This Assignment is for the sole benefit of the parties hereto, their permitted assigns and nothing herein expressed or implied shall give or be construed to give any Person, other than the parties hereto and such permitted assigns, any legal or equitable rights hereunder.

11.    _Counterparts_.  This Assignment may be executed in one or more counterparts (including by means of facsimile pdf or other electronic signature pages), all of which shall be considered one and the same agreement, and shall become effective when one or more such counterparts have been signed by each of the parties and delivered to the other party.

*[Signature page follows]*

**AGREED:**

ASSIGNORS:

RHINO RUSH, LLC

By:

Name: Jeremy Swenson

Title: Chief Technical Officer and Member

State of Idaho )
County of Ada )

On this 11ᵗʰ day of March, 2019, before me, Michael B. Howell a notary public, personally appeared Jeremy Swenson , proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument, and acknowledged to me that he executed the same.

Seal

MICHAEL B. HOWELL
COMMISSION #2250
NOTARY PUBLIC
STATE OF IDAHO
MY COMMISSION EXPIRES_____

Notary Public

My Commission Expires on  9/21/2021

ASSIGNEE:

RAW PHARMA, LLC

By:

Name: Jesse McMullin

Title: CEO

*[Signature Page to Copyright, Trademark, and Domain Name Transfer Agreement]*

APPROVED:

Joshua J. Swenson.

**EXHIBIT A**

**COPYRIGHTS**

Registered Copyrights

NONE

Unregistered Copyrights

1. www.rhinorush.com, www.rhinorushllc.com
2. Rhino Rush product logo
3. Rhino Rush product packaging
4. Other product materials and product collateral
5. Social media sites, accounts and logins, including Instagram (rhinorushllc), Twitter (@rhinorushllc), Facebook (Rhino Rush LLC—http://m.facebook.com/RhinoRush/), LinkedIn (rhinorushllc)
6. All other existing content created by Rhino Rush or its agents/representatives

## EXHIBIT B

### TRADEMARKS

USPTO Serial Number 86412757, Registration Number 4747390

**EXHIBIT C**

**DOMAIN NAMES TRANSFERRED**

| Domain | Registrant | Registrar | Expiration Date | Country |
|---|---|---|---|---|
| Rhinorush.com | Rhino Rush, LLC | | | USA |
| Rhinorushllc.com | Rhino Rush, LLC | | | |

#89880763v5

PERSONAL GUARANTY
OF OBLIGATIONS OF RHINO RUSH, LLC
EFFECTIVE 1 MARCH 2019

FOR VALUE RECEIVED, and in consideration for, and as an inducement to Raw Pharma, LLC, a Utah limited liability company ("Raw Pharma"), to enter into the Voluntary Asset Transfer Agreement (the "Asset Transfer Agreement") relating to the assets and obligations of Rhino Rush, LLC, an Idaho limited liability company (the "Rhino Rush"), the undersigned unconditionally guarantees to Raw Pharma the full and timely performance of all of Rhino Rush's covenants, conditions, and agreements in the Asset Transfer Agreement and the Ancillary Documents (as that term is defined in the Asset Transfer Agreement). In addition, the undersigned expressly agrees that the validity of this Guaranty and the obligations of the undersigned will not be terminated, affected, or impaired by reason of (i) any forbearance, settlement or compromise between Raw Pharma and Rhino Rush, (ii) the invalidity of the Asset Transfer Agreement or Ancillary Documents for any reason whatsoever, or (iii) the release of Rhino Rush from any of Rhino Rush's obligations under the Asset Transfer Agreement or Ancillary Agreements by operation of law or otherwise, including, without limitation, the rejection or assignment of the Asset Transfer Agreement or Ancillary Documents in connection with any bankruptcy proceeding.

The undersigned further covenants and agrees as follows: This Guaranty will remain in full force and effect as to any renewal, modification or extension of the Asset Transfer Agreement or Ancillary Agreements, whether or not known to, or approved by, the undersigned. No assignment of the Asset Transfer Agreement or Ancillary Documents (or any interest therein) will operate to extinguish or reduce the liability of the undersigned. In the event of any termination of the Asset Transfer Agreement or Ancillary Documents by Raw Pharma, the undersigned's liability will not be terminated, but the undersigned will be and remain liable for all damages, costs, expenses and other claims which may arise under the Asset Transfer Agreement or Ancillary Documents. If the undersigned has or will, directly or indirectly, loan money to Rhino Rush, the repayment of such money will be subordinate in all respects to Rhino Rush's payment of the amounts then and thereafter due to Raw Pharma under the Asset Transfer Agreement or Ancillary Documents.

Wherever reference is made to the liability of Rhino Rush in the Asset Transfer Agreement or Ancillary Documents, such reference will be deemed to include the liability of the undersigned, jointly and severally, with Rhino Rush and any other guarantors. The liability of the undersigned for the obligations of the Asset Transfer Agreement and Ancillary Documents will be primary. In any cause of action that accrues to Raw Pharma under the Asset Transfer Agreement or Ancillary Documents, Raw Pharma may, at Raw Pharma's option, proceed against the undersigned and Rhino Rush and other guarantors, jointly and severally, or proceed against the undersigned without having demanded performance of, commenced any action against, or obtained any judgment against Rhino Rush or the other guarantors. The undersigned hereby waives any obligation on the part of Raw Pharma to enforce the terms of the Asset Transfer Agreement or Ancillary Documents against Rhino Rush as a condition to Raw Pharma's right to proceed against the undersigned. The undersigned hereby expressly waives: (i) notice of acceptance of this Guaranty, and of presentment, demand and protest; (ii) notice of any default hereunder or under the Asset Transfer Agreement or Ancillary Documents, and notice of any indulgence afforded Rhino Rush; (iii) demand for observance or performance of, or enforcement of, any terms or provisions of this Guaranty or the Asset Transfer Agreement and Ancillary Documents; and (iv) all other notices and demands otherwise required by law which the undersigned may lawfully waive. The undersigned agrees that in the event this Guaranty is enforced by suit or otherwise, the undersigned will reimburse the Raw Pharma, upon demand, for all expenses incurred in connection therewith, including, without limitation, reasonable attorney's fees.

The undersigned hereby waives, to the maximum extent permitted by law, all defenses available to a surety, whether the waiver is specified herein or not.

It is further agreed that all of the terms and provisions hereof will inure to the benefit of the successors, personal representatives and assigns of the Raw Pharma, and shall be binding upon the estate, heirs, executors, and personal representatives of the undersigned.

This Guaranty will be governed by the laws of the State of Texas, and will be performed in all respects in Collin County, Texas.

This Guaranty is made effective March 1, 2019.

GUARANTOR:

Jeremy Swenson, individually

Address: 6269 W. FRENCH GLEN     CT   Joshua J. Swenson
        EAGLE  ID  83616

5/11/19
Signature Date:

State of Idaho          )
County of  Ada          )

On this 11th day of March, 2019, before me, Michael B. Howell a notary public, personally appeared Jeremy Swenson & Jeremy Swenson, proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument, and acknowledged to me that he executed the same.

Seal

MICHAEL B. HOWELL
COMMISSION #2250
NOTARY PUBLIC
STATE OF IDAHO
MY COMMISSION EXPIRES_____

Notary Public
My Commission Expires on  9/24/2021

*[Signature page for Personal Guaranty of Obligations of Rhino Rush, LLC]*



1 March 2019

GS1 US, Inc.
Attn: Lori Taylor, Member Services
7887 Washington Village Dr., Ste. 300
Dayton, OH 45459

Dear Ms. Taylor:

This letter is to confirm that effective 1 March 2019, Rhino Rush, LLC ("**Company**") voluntarily transferred all the assets of Rhino Rush, LLC to Raw Pharma, LLC, a Utah limited liability company. Accordingly, Company has agreed to transfer all GS1 Company Prefixes in their entirety to Raw Pharma, LLC, and Company relinquishes the rights to all GS1 Company Prefixes, and does not intend to use such prefixes with any Company related product(s).

I am sending this to you as Chief Technical Officer of Rhino Rush, LLC. I am a duly authorized representative of the Company and am authorized to execute this letter on its behalf.

If you have any questions or concerns, please contact Mark Clark, Raw Pharma's Chief Operations Officer, at 678-862-2918.

Regards,

Rhino Rush, LLC

(By Jeremy Swensen, CTO)

Cc: Mark Clark, Raw Pharma, LLC (Chief Operations Officer)



March 1, 2019

[insert account debtor name, address, email[

**NOTICE TO CUSTOMERS OF PAYMENT ASSIGNMENT AND ASSIGNMENT OF
"RHINO RUSH" BRAND**

Dear [insert account debtor name]:

We are notifying our valued customers of two important changes. First, effective March 1, 2019,
the Rhino Rush® brand is under new ownership. Raw Pharma, LLC, which has manufactured all
Rhino Rush® energy shots and energy drinks since 2014, will continue to make all Rhino Rush®
brand energy shots and drinks, and will service your account. Second, Rhino Rush, LLC has sold
all of its rights to payment of amounts due, to Raw Pharma, LLC. **Effective immediately, you
must pay all amounts currently owing, and all amounts owing in the future, to Raw Pharma,
LLC, at the following address:**

**Raw Pharma, LLC**

_____

_____

Please change the entity and the address for payment.

If you have any questions, please contact Marc Howell at money@rawpharma.com, or call him at
208-866-0363.

Sincerely yours,

Jeremy Swenson

Cc: Marc Howell, Raw Pharma Director of Operations

# EXHIBIT D



# The All New Rhino Rush - Coming Soon!

Thank you for being patient. We are doing some work on the site and the all new RHINO RUSH will be coming soon.

 (https://www.facebook.com/RhinoRush/)     (https://twitter.com/RhinoRushLLC)

 (http://rhinorush.com/wp-login.php)

# EXHIBIT E

# The All New Rhino Rush

◯   RHINO RUSH LLC · THURSDAY, MARCH 21, 2019

Plano, TX, Release: March 21, 2019. *For Immediate Release*

Rhino Rush, LLC has announced today that it has acquired the assets of the Rhino Rush® brand. Product manufacturing and development will continue to be supplied, as it has been for the past four years, by the same company and manufacturing facilities, now located in Plano, TX. Although leadership has changed, most of the same team will remain.

"We are excited, and look forward to continuing, to bring quality Rhino Rush® products to stores everywhere. Research and innovation will always be at the core of each of our energy products. Expect us to bless the lives of others in the DFW Metroplex, and nationwide, through creative and heartfelt corporate responsibilities," says the new Rhino Rush® management team.

"As for the future of Rhino Rush®, we intend to bring energy products that are cleaner, and safe for sport, while attempting to improve an individual's work performance."

Rhino Rush® products are currently sold in more than 25,000 convenience and grocery stores. The company intends to continue to expand over time. The Rhino Rush® brand was started in 2012. Rhino Rush, LLC, is now a proud Texas company, headquartered in Plano, and will continue to service the 25,000 stores, as well as servicing eCommerce. (www.RhinoRush.com)

Contact Info:

NAME: Rachel McCulley

Organization: Rhino Rush, LLC

Address: 1000 Shiloh Rd. Suite 200, Plano, TX 75074

Email: rachel@rhinorush.com

# EXHIBIT F



**To:** ████████████

**Subject:** Temporary Work Offer

**Effective Dates:** ███████████████

**Role:** ████

**Working Location:** ██████████████, Boise, ID 83713

**Company Address:** 1000 Shiloh Rd, STE 200 – Plano, Texas 75074

Dear ██████,

We would like to extend you a temporary work assignment with the all new Rhino Rush, LLC, based out of Plano, TX!  This is a temporary work assignment because there is still much we are trying to put together as we are restructuring this new company.  During these ███ days, it is our hope to begin to build a company that you would be proud of, a company where we are beginning to make plans to hire employees that might enjoy benefits such as: Paid Time Off (PTO), insurance, forecasted growth, and leadership/advancement opportunities.

During this restructuring time, you will be contracted to:

████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████

You will be paid ████████████████████, on the condition that you work a minimum of 5 full business days per week, such to be determined between you and Rhino Rush. Approved travel will count as working days. You will be reimbursed expenses incurred for work approved by Rhino Rush, such reimbursement being according to policies then in place at Rhino Rush. Please ask us if you have questions.

████████████████ with payment made approximately payable approximately on the 15th and last day of the month. From time to time, between now and by May ██ 2019, we will be discussing with you, individually, and with the team the following:

- New pricing strategies
- Sales forecasts for the remainder of 2019
- Targeted/focused customer relationships
- What comprises an acceptable "deal"
- Transferable and replicable best practices
- New energy products
- New, _improved_ bonus structure
- Benefits packages

I am sure you have much anxiety at this time with all the changes happening so quickly, and for this I apologize.  We are moving _quickly_ to bring a completed structure to the new Rhino Rush and your input, dedication, drive, and excellence will be needed over this period.  By the end of the effective date, we will be reviewing and hiring people for regular full-time employment.  We are contracting your expertise at this time because of your excellence, demonstrated ability to ████████████████████, and because of your dedication to the brand.  Please know that you are not committing to Rhino Rush permanently, and that both you and Rhino Rush can cancel this assignment by giving 7 days' advance written notice for any (or no) reason.  We know that you are learning to trust us and the circumstances might require you to change

your work, although we hope that our needs and yours will be aligned. Of course, this letter does not promise future employment with Rhino Rush or any other company.

You will be an independent contractor during the time this temporary work assignment is effective. However, Rhino Rush may (but is not obligated to) provide working space, resources, and materials at our offices as we may agree. You won't be Rhino Rush's employee and won't be entitled to employee benefits. But subject to general conditions determined between you and Sam Rubin, Vice President of Sales (or another individual designated by Rhino Rush), you will provide work for the company in a manner you determine best. If you ever have questions or concerns, please work directly with Sam.

Please sign the below if you accept this temporary work assignment while we work behind you to build this into an AMAZING company. We will strive for excellence while Rhino Rush supports you in your excellence.

Sincerely,


Jesse McMullin
CEO
Rhino Rush

Please sign if you agree to terms: _____
Printed Name: _____
Address: _____